UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STANLEY P. LASKOWSKI III | : | |
| and MARISOL LASKOWSKI, | : | CIVIL ACTION |
| 25 ½ Rear Left Belmont St. | : | MEDICAL PROFESSIONAL |
| Carbondale, Pennsylvania 18407 | : | LIABILITY |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | BENCH TRIAL |
| | : | |
| UNITED STATES OF AMERICA | : | |
| DEPARTMENT OF VETERANS (021B) | : | |
| AFFAIRS GENERAL COUNSEL | : | ELECTRONICALLY FILED |
| 810 Vermont Avenue NW | : | |
| Washington, D.C. 20420 | : | |
| | : | |
| Defendant. | : | |

_____

**COMPLAINT**

_____

Plaintiffs Stanley P. Laskowski, III and

Marisol Laskowski, by and through undersigned counsel,

state the following as their Complaint against

Defendant United States of America:

## <u>INTRODUCTION</u>

1.   In the early morning hours of 13 August

2007, a former United States Marine Corps Sergeant

whose valor and honor had been forged as a fire squad

leader in combat service to our nation, crouched for hours at an objective rally point, reconnoitering a supply post that held supplies necessary to his survival.  He was clad in black and armed.  He estimated that he must complete this mission in minutes before an alarm would signify his presence and scuttle the effort.  After nearly three hours, the clouds screened properly the moon's ambient light, and the mission was launched.  With the supplies secured, the Marine stealthily exited the scene.

2.   On this day, Stanley P. Laskowski III's mission was not against a foreign enemy objective of the sort he had battled honorably during the 1st Marine Division's advance on Baghdad several years earlier. There was no honor in this mission, only desperation. There would be no medal awaiting Mr. Laskowski.  As Mr. Laskowski realized upon his arrest for felony burglary and criminal trespass in the hours that followed, these actions marked a fall from honor and the end of a

promising new career destined to support his wife and
three children in his native northeastern Pennsylvania.

3.   13 August 2007 marked the last step in
what had for months been a predictable and preventable
train wreck of decompensation.  But before he helped
himself into that pharmacy in Olyphant, Mr. Laskowski
had months earlier – and almost immediately after his
honorable discharge from the United States Marine Corps
– sought medical treatment and care at the Wilkes-Barre
Veterans Affairs Medical Center ("WBVAMC") for Post-
Traumatic Stress Disorder ("PTSD") incident to his
combat service.

4.   The medical treatment and care Mr.
Laskowski received, however, in the period of time
between his honorable discharge from the United States
Marines and the final act in his decompensation on 13
August 2007, fell grossly below the prevailing standard
of care.  As set forth below, the WBVAMC failed to
properly treat Mr. Laskowski for the terrible disease
that impacted him so severely.  To the contrary, the

3

WBVAMC's treatment of Mr. Laskowski exacerbated and worsened his condition, causing Mr. Laskowski and his family to endure months of extreme pain, emotional distress, and ultimately causing him permanent injury and loss of future earnings incident to his 13 August 2007 decompensation.

5.   In the end, the WBVAMC caused Mr. Laskowski and his wife foreseeable physical, psychiatric, and emotional injury.  It deprived Mr. Laskowski of his career, of the relationship he had previously enjoyed with his wife and family, and, significantly, of the honor and reputation that he so deservedly earned during his service to our Country.

6.   This is an action to place Mr. Laskowski, his wife, and their children in the position they would have been absent gross professional medical negligence, abandonment, and mistreatment by the WBVAMC.

## JURISDICTION AND VENUE

7.   On 2 March 2009, the Laskowskis filed separate Standard Form 95 Claims for Damage, Injury, or

Death as a consequence of the matters at issue in this lawsuit.

8.   On 21 September 2009, the Office of Regional Counsel for the Department of Veterans Affairs advised undersigned counsel that it had completed its investigation and, alarmingly, his claim was denied.

9.   Plaintiffs have exhausted their administrative remedies pursuant to 28 U.S.C. § 2675, and Plaintiffs have properly commenced this lawsuit against the United States of America.

10.  This Court holds jurisdiction pursuant to 28 U.S.C. § 1331, because the claims arise under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq.  The Court also holds supplemental jurisdiction to consider claims arising under the laws of the Commonwealth of Pennsylvania pursuant to 28 U.S.C. § 1367(a).

11.  Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b), because substantial events and omissions giving rise to the

claims occurred within the Middle District of Pennsylvania.

**PARTIES**

12. Plaintiff Stanley P. Laskowski III is an adult individual residing with his wife and four children at 25 ½ Rear Belmont Street, Carbondale, Pennsylvania 18407. Mr. Laskowski is a native of Throop, Pennsylvania. He was born on 26 January 1978, graduated from Bishop O'Hara High School on 31 May 1996, married Mrs. Laskowski on 22 October 2002, and served most honorably in the United States Marine Corps between February 1999 and February 2007.

13. Plaintiff Marisol Laskowski is an adult individual residing with her husband and four children at 25 ½ Rear Belmont Street, Carbondale, Pennsylvania 18407. Mrs. Laskowski is a native of El Monte, California. She was born on 18 February 1974, graduated from Mountain View High School on 15 June 1992, and married Mr. Laskowski on 22 October 2002. Following Mr. Laskowski's honorable discharge from the

United States Marine Corps in February 2007, Mrs.
Laskowski and her family moved to Throop, Pennsylvania
to be near Mr. Laskowski's extended family.  Due to Mr.
Laskowski's permanent injuries, Mrs. Laskowski is
unable to work.

14. At all times material hereto, Defendant,
United States of America, undertook – through its
agents, servants, workers, ostensible agents, and
employees at the WBVAMC – to provide medical and health
care services to veterans like Mr. Laskowski.  The
WBVAMC is a "health care provider," as that term is
defined by the Medical Care Availability and Reduction
of Error Act (M-Care Act) and is engaged in the
business of providing health care and services to
veterans of the United States services, maintaining a
principal place of business at 1111 East End Blvd.,
Wilkes-Barre, Pennsylvania 18711.  At all times
material hereto, the WBVAMC acted individually and by
and through its agents, servants, workers, ostensible
agents, and employees, including Bernard M. Borowski,

7

P.A., Eugene T. Lucas, Jr., R.N., Jennifer Pierce,
P.A., Aruna Bhatia, M.D., and various other doctors,
nurses, technicians, assistants, staff, workers,
agents, ostensible agents and employees.

15. Defendant United States of America – by
and through the WBVAMC and its agents, servants,
workers, ostensible agents, and employees – held itself
out as a provider and institution equipped and staffed
to provide skilled and competent diagnosis and
treatment of medical conditions, including the medical
condition from which Mr. Laskowski suffered and
continues to suffer.

16. Plaintiffs are asserting, among other
things, professional liability claims against
Defendant, United States of America.

**FACTUAL BACKGROUND**

**A.**   ***Mr. Laskowski's Service in the United States Marine Corps***

17. Stanley P. Laskowski, III, like his father and grandfather for whom he is named, served with honor in the United States Marine Corps.

18. Mr. Laskowski voluntarily enlisted on 23 February 1999 as an infantry Rifleman.  Four years later, Mr. Laskowski was deployed to Kuwait as a fire squad leader in the grade of Sergeant with the 3rd Battalion, Fifth Marines, 1st Marine Division.

19. Between 20 March 2003 and 20 April 2003, the 1st Marine Division undertook the fastest advance on a capital city in military history.  Clad for much of the invasion in chemical and biological over-garments, the 1st Marine Division moved over 1,000 kilometers and destroyed enemy in a number of pitched battles on its way to Baghdad and beyond.

20. During this mission, Mr. Laskowski led his squad through fierce combat operations with valor and

distinction.  Mr. Laskowski's Platoon Commander, Second

Lieutenant Casey Brock, authored a performance review

that highlighted combat operations in Operation Iraqi

Freedom from 20 March 2003 to 31 March 2003:

> During this period, Sergeant Laskowski was
> involved in several engagements in Iraq,
> including the seizure of the Rumaili Oilfields
> and a number of fierce engagements with the
> enemy.  While under fire, Sergeant Laskowski
> proved to be a highly effective combat leader
> and has been nominated for the Navy Achievement
> Medal with a Combat "V".  Sergeant Laskowski
> was often tasked with additional duties,
> frequently taking on the responsibilities of
> the platoon sergeant as well as those of a
> squad leader.  His tactical proficiency and
> strong character have made him among the most
> valued and respected NCOs in the company.  I
> highly recommend him for promotion and
> retention.

21.  In the same performance review, Mr.

Laskowski's Company Commander, Captain Ethan Bishop

declared:

> Sgt. Laskowski led his platoon well through
> multiple combat engagements. Newly promoted
> Sergeant who has gained a great deal of
> knowledge and experience during combat
> operations in OIF [Operation Iraqi Freedom].
> Highly dependable NCO who enjoys a challenge
> and the chance to meet the enemy on the

10

battlefield.  Although junior to his peers in time in grade, he already holds a position amongst the middle of his peer group of 21 sergeants.  His courage under fire and aggressiveness allowed the platoon to repel an enemy counter-mech ambush on 25 March and subsequently drive north clearing the route for RCT-5 and the Division.  Recommended for billets of increased responsibilities.  Promote and retain.

22.  The events of 25 March 2003 for which Captain Bishop lauded Mr. Laskowski's performance involved "heavy fighting with a company-sized irregular enemy force."  During this three day operation that took place near Highway 1 at an objective just east of Ad Diwaniyah, the 3rd Battalion overcame "the fog and friction of war during a horrific sandstorm, which was followed by rain, and golf ball-sized hailstones."

23.  On 3 April 2003, the 3rd Battalion cleared enemy forces in Aziziyah.  The enemy forces amassed significant resistance from defensive positions along the highway and defended with two dismounted companies from within the confines of the city.  Fierce fighting continued for several hours in the town.  The enemy

armaments included tanks, mechanized vehicles, air defense artillery, long-range artillery, and mortars from the Republican Guard.  This day's activities were described as the most significant battle against conventional forces during the war.

24.  On 4 April 2003, the 1st Marine Division attacked along Highway 6 in an effort to clear the southeastern approach to Baghdad.  Mr. Laskowski's 3rd Battalion conducted a dismounted attack on both sides of the highway.  In eight hours of close combat, the 3rd Battalion destroyed hundreds of enemy fighters and uncovered a well-stocked terrorist training center.

25.  In a performance review covering the period 1 April 2003 through 8 June 2003, Mr. Laskowski's Company Commander reported that:

> Sgt. Laskowski led his squad well through
> multiple combat engagements including
> engagements through the cities of An Numiniyah,
> Al Aziziyah, and southern Baghdad.  Trained a
> large number of new joins while conducting
> combat operations in the city of Ad Diwaniyah.
> Highly dependable NCO.  His courage under fire
> and aggressiveness allowed the platoon to
> destroy enemy and terrorists alike in close

fighting under intense fires.  Recommended for
billets of increased responsibilities.  Highly
regarded and recommended for promotion and
retention.

26.  After the invasion of Baghdad, Mr.
Laskowski's 3rd Battalion moved north to Samarra and
Tikrit, providing in place relief to other coalition
battle forces.

27.  Mr. Laskowski proved himself valorous and
courageous in service to his Country during Operation
Iraqi Freedom.  In battle, Mr. Laskowski also
experienced the horror of combat.  He witnessed young
Marines under his command killed in action.  He
witnessed the collateral affects of war upon young
Iraqi children caught in a war zone.  And he himself
had been forced to engage enemy combatants on the open
battlefield and in crowded urban settings.

28. For his service, Mr. Laskowski was awarded
the Navy and Marine Corps Achievement Medal with 1
star, the Marine Corps Good Conduct Medal with 1 star,
the Combat Action Ribbon, the Iraq Campaign Medal, the

Global War on Terrorism Service Medal, the Sea Service Deployment Ribbon with 1 star, and the National Defense Service Medal.

29. Mr. Laskowski returned to his duties as a Marksmanship Coach and Instructor in Parris Island, South Carolina, and – for the next four years – he continued to perform with distinction.

30. In a performance review for the period 22 April 2006 through 4 July 2006, Mr. Laskowski's supervising officer, Captain Jason E. Broene, described Mr. Laskowski as "a top rate sergeant who is an invaluable asset to his unit and the Marine Corps. His thoughts, ideas, and opinions are highly regarded by all those in his chain of command." The review went on to note that Mr. Laskowski "is extremely articulate both verbally and in writing. His communication skills are far superior to that of his peers while displaying a unique ability to train and influence Marines and recruits in combat marksmanship skills."

14

31. In the same performance review, Major
Clark Watson called Mr. Laskowski:

> [A] stellar Marine sergeant who makes things
> happen.  Sergeant Laskowski is among the top 10
> sergeants that I have reviewed in the last 15
> years. His ability to take mission-type orders
> and translate them into results in training and
> practical application is without equal in this
> command.  Key link in writing and re-instating
> combat marksmanship skills and associated
> drills, along with introduction to the squad
> automatic weapons and AT-4 tracer trainer.  A
> must for retention and assignment to the FMF.
> Ensure attendance at resident PME. Promote
> ahead of peers.

32. In his final performance review in the
United States Marine Corps for the period covering 5
July 2006 through 5 February 2007, Mr. Laskowski's
supervisor, 1st Lieutenant John B. Cadwalader, explained
that Mr. Laskowski had:

> [D]isplayed exceptional initiative, creativity,
> and attention to detail in the production of
> lesson plans and training materials . . .,
> exhibited strong managerial skills in the
> tasking of personnel, accomplishment of tasks,
> and the development of subordinates.  [Mr.
> Laskowski] contains limitless potential and is
> expected to excel in all endeavors in the
> civilian world.  Should [Mr. Laskowski] choose
> to return to active duty, I strongly recommend
> his full reinstatement.

15

33.  After eight years of service, Mr. Laskowski was honorably discharged from the United States Marine Corps on 5 February 2007.

**B.  _Mr. Laskowski and his Family Return Home to Northeastern Pennsylvania_**

34.  Upon discharge, Mr. Laskowski and Marisol moved their three children to northeastern Pennsylvania, where Mr. Laskowski planned to begin a career and raise his family near Mr. Laskowski's parents and extended family.

**C.  _Mr. Laskowski Seeks Medical Care from the WBVAMC_**

35.  In his final weeks with the United States Marine Corps in January and February 2007, Mr. Laskowski participated in a transition assistance program during which he identified a list of his medical ailments and was instructed that – upon separation from the Marine Corps – he should contact his local Veterans Affairs Outreach Center and arrange for compensation and pension screenings related to his service connected injuries.

16

36. In March 2007, Mr. Laskowski met with Ruth Gonzales at the VA Outreach Center to begin this process.  The two discussed Mr. Laskowski's service records and health, and Ms. Gonzales assisted Mr. Laskowski in arranging for compensation and pension screenings.  Although Mr. Laskowski did not reference PTSD in his list of military injuries or even believe himself afflicted with PTSD, Ms. Gonzales' evaluation revealed that Mr. Laskowski was suffering from nightmares, intrusive thoughts, increased irritability, paranoia and sleeplessness.  Ms. Gonzales advised Mr. Laskowski that she would identify PTSD on his compensation and screening form so that he could be further evaluated for possible PTSD diagnosis.

37. Following this meeting at the VA Outreach Center, the WBVAMC contacted Mr. Laskowski to begin scheduling compensation and pension screenings.

38. On 11 April 2007, Mr. Laskowski presented to the WBVAMC for the first such appointment.  On this day, Mr. Laskowski was to be evaluated by a staff

17

podiatrist for right heel pain relating to an injury
suffered in Iraq.  During this appointment, Mr.
Laskowski complained of insomnia of three days
duration.  Additionally, he complained of certain other
of his PTSD symptoms.  Mr. Laskowski requested the
WBVAMC treat him, and Mr. Laskowski was told he could
go to the WBVAMC Emergency Room for treatment.

39. Mr. Laskowski presented to the WBVAMC
Emergency Room on 11 April 2007.  There, he was
evaluated and treated by Physicians Assistant #1.  Mr.
Laskowski advised Physicians Assistant #1 that he had
not slept in three days, that he was suffering from
regular nightmares, intrusive thoughts and daydreams
relating to his combat service.  According to progress
notes created by Physicians Assistant #1, Mr. Laskowski
complained of classical symptoms of a dangerous and
acute exacerbation of chronic, combat-related PTSD.
Physicians Assistant #1 prescribed low-dose Trazodone
and documented the need for a follow up PTSD
psychiatric department consult.

18

40. However, the needed consult was never acted upon by the WBVAMC.  Due to Trazodone side effects causing Mr. Laskowski nausea and vomiting, he stopped taking the medication after one day.

41. On 11 May 2007, Mr. Laskowski returned for a psychiatric intake evaluation.  A nurse practitioner performed this psychiatric intake at the WBVAMC psychiatric outpatient clinic.  Based upon the circumstances, Mr. Laskowski personally believed that the nurse practitioner was a psychiatrist and he was not informed otherwise.  <u>Mr. Laskowski complained of suicidal thoughts, anger with his wife and children for no apparent reason, and combat flashbacks prompted by certain recollections or smells</u>.  Mr. Laskowski asked for treatment to stop the dreams and flashbacks. According to WBVAMC progress notes, the nurse practitioner confirmed the diagnoses of PTSD and Depression.  <u>Inexplicably, the nurse practitioner prescribed Clonazepam and Buproprion with follow up in two months</u>.  A staff physician at the WBVAMC

19

acknowledged and approved the nurse practitioner's treatment conduct.

42. On 17 May 2007, Mr. Laskowski reached out to the WBVAMC psychiatric clinic by telephone, and talked to physician assistant #2. <u>Mr. Laskowski advised Physicians Assistant #2 that he wanted to put his own head & someone else's head through a window</u>. According to WBVAMC progress notes, Mr. Laskowski advised Physicians Assistant #2 that he was experiencing PTSD symptoms, including nightmares, flashbacks, anxiety and irritability. <u>Physician assistant #2 neither conducted nor scheduled an examination of Mr. Laskowski. Instead, she directed Mr. Laskowski to discontinue Buproprion and start Paroxetine</u>. She directed Mr. Laskowski to call back in two weeks. The nurse practitioner who saw Mr. Laskowski six days earlier acknowledged and approved Physicians Assistant #2's conduct.

43. On 31 May 2007, Mr. Laskowski again reached out to the psychiatric clinic by telephone and

spoke again with the nurse practitioner.  He complained

of severe and debilitating anxiety.  He felt paranoid

and anxious all the time.  He explained to the nurse

practitioner that he felt he was going to burst out of

his skin, and that he needed help.  According to WBVAMC

progress notes, the nurse practitioner directed Mr.

Laskowski – without seeing him clinically – to continue

taking only the Clonazepam, and then report back by

phone in one week.

44. As directed, Mr. Laskowski contacted the

nurse practitioner by telephone on 4 June 2007,

reporting no change in his symptoms.  Without seeing

Mr. Laskowski clinically, the nurse practitioner

doubled Mr. Laskowski's dose of Clonazepam.  Mr.

Laskowski was told to follow up on 3 July 2007.

45. At or around this time, Mr. Laskowski

disclosed to the nurse practitioner that he was always

armed and maintained an arsenal of weapons in his home

in order to defend himself and his family.  He

disclosed that he had instructed his wife on using his

21

weapons to protect the family if Mr. Laskowski was
taken in an assault of the house.  Mr. Laskowski
regularly required his wife to accompany him to a local
shooting range in order to train for this eventuality.

46.  <u>Mr. Laskowski also disclosed to the nurse
practitioner that he had attempted to enter the
neighbor's home by force while armed</u>.  Mr. Laskowski
advised the nurse practitioner that he "did not know"
what he would have done if he gained access to the
neighbor's home.

47.  On 22 June 2007, Mr. Laskowski again
contacted the nurse practitioner by telephone at the
WBVAMC.  According to progress notes created by the
nurse practitioner, Mr. Laskowski reported suffering
continued symptoms, including drowsiness and decreased
sex drive.  Without seeing Mr. Laskowski clinically,
the nurse practitioner ordered a reduction in the dose
of Clonazepam.  A staff physician at the WBVAMC
acknowledged and approved the nurse practitioner's
conduct approximately three weeks later.

22

48.  On 3 July 2007, Mr. Laskowski presented to the WBVAMC for a scheduled appointment with the nurse practitioner.  Mr. Laskowski complained of anger toward his wife, who had been complaining to Mr. Laskowski about the fact that he was regularly working long hours and coming home intoxicated.  Mr. Laskowski reported suicidal thoughts and other serious symptoms of his disease, including alcohol abuse.  Mr. Laskowski asked for help in managing the symptoms of his disease.  He complained that the Paxil made him feel as though he was going to "crawl out of his skin."  Inexplicably, the nurse practitioner responded to these conditions by adding low-dose Buspirone and scheduling Mr. Laskowski for a follow-up visit "no earlier than two weeks."  On 10 July 2007, a supervisor at the WBVAMC acknowledged and approved the nurse practitioner's conduct.

49.  On 16 July 2007, Mr. Laskowski again reached out to the nurse practitioner at the WBVAMC by telephone.  Mr. Laskowski complained that he was becoming increasingly irritable and that he had stopped

23

taking Buspirone.  Mr. Laskowski disclosed he had doubled his dose of Clonazepam.  All prior medications had failed to relieve his suffering.  He reported continued paranoia, thoughts of self-harm, irritability, and restlessness.  The nurse practitioner only noted the call.  He neither saw Mr. Laskowski nor scheduled him for a clinical visit, deferring further treatment until Mr. Laskowski had a psychiatric consult.

50.  On 18 July 2007, Mr. Laskowski's wife pleaded by telephone with the nurse practitioner at the WBVAMC.  Mrs. Laskowski advised that her husband's condition was extreme, and that his anger was causing them great emotional distress.  Mrs. Laskowski reported her husband was abusing alcohol and medication, and that the WBVAMC needed "to get something started."  At that point, the nurse practitioner purportedly placed a single unanswered telephone call to Mr. Laskowski.

51.  In spite of the urgent clinical need to act, the WBVAMC did nothing further.

24

52.  Then on 13 August 2007, the Olyphant Police Department contacted the WBVAMC after arresting Mr. Laskowski.  <u>The Olyphant Police asked if the WBVAMC would admit Mr. Laskowski</u>.  The WBVAMC declined.

53.  Mr. Laskowski was arraigned and jailed at the Lackawanna County Prison to await trial on charges of Felony Burglary, Felony Criminal Trespass, Theft by Unlawful Taking, Receiving Stolen Property, Reckless Endangerment, Loitering and Prowling at Night, Unlawful Carrying of Firearms, Criminal Mischief, and Possessing Instruments of a Crime (namely, a Springfield Armory XD-357 Semi-Automatic Handgun and a Tire Iron).

D.   ***<u>Mr. Laskowski Lost a Promising Career at Keystone Financial</u>***

54.  Upon his return to northeastern Pennsylvania, Mr. Laskowski landed a job as a financial advisor and sales associate with Keystone Financial's Moosic, Pennsylvania office*.*

55. While at Keystone Financial, Mr. Laskowski worked to develop a client base to whom he would sell insurance and investment products.

56. Even while suffering under the severe symptoms of PTSD that had been exacerbated by grossly deficient care at the WBVAMC, Mr. Laskowski – consistent with his Marine Corps service record – out-performed other associates of his level.

57. Although the symptoms of his disease required him to be armed at all times and hampered him in so many significant ways, a supervisor at Keystone Financial described Mr. Laskowski as tremendously disciplined, motivated, and capable.

58. Amidst his personal crisis, Mr. Laskowski was "a superstar" employee with acknowledged promise, outperforming almost all objective measures for associates of his level.

59. But despite all of the qualities and attributes that made him a dependable soldier, colleague, and sales person, Mr. Laskowski's supervisor

26

noticed that his condition and performance was deteriorating in the weeks preceding his arrest.

60. Upon his arrest on 13 August 2007, Keystone Financial was forced to terminate Mr. Laskowski's employment and update his U-4 to reflect pending felony criminal charges.

61. On 13 August 2007, Mr. Laskowski's career as a financial service professional effectively ended.

**E.    _Impact Upon Mr. Laskowski and His Family During the Period of Decompensation and Thereafter_**

62. During the period of his treatment with the WBVAMC, Mr. Laskowski suffered extreme pain and suffering and emotional distress. As set forth above, Mr. Laskowski's PTSD was exacerbated and worsened by the grossly negligent care he received at the WBVAMC.

63. In addition to the pain and suffering incident to his physical and emotional injuries, Mr. Laskowski suffered and continues to suffer a loss of society from his wife, his children, and his extended family.

27

64. During the period of Mr. Laskowski's treatment with the WBVAMC and thereafter, Mrs. Laskowski suffered and continues to suffer a loss of society with her husband.

65. Mrs. Laskowski also suffered extreme anxiety during the WBVAMC's treatment of her husband relative to concerns for the safety and welfare of herself, her three young children, and her husband.

66. Since the events of 13 August 2007 and the resulting termination from Keystone Financial, Mr. Laskowski has been unable to secure gainful employment. It is anticipated that this unemployability will continue into the future.

67. Mr. Laskowski was incarcerated at the Lackawanna County Prison. Mr. Laskowski was later admitted to an inpatient PTSD clinic at the Veterans Affairs Medical Center in Coatsville, Pennsylvania. Mr. Laskowski was formally diagnosed 100% PTSD disabled by the United States of America.

28

68. Presently, Mr. Laskowski continues to serve a probationary sentence for the events of 13 August 2007, and he is unable to work as a consequence of the deficient medical care and treatment received at the WBVAMC.

## COUNT I – Professional Malpractice

### Stanley P. Laskowski, III v. United States of America

69. Plaintiffs incorporate by reference the allegations and averments set forth in paragraphs 1 - 68, as though set forth at length here.

70. At all times material hereto, the doctors, physicians, residents, interns, externs, nurses, technicians, nursing assistants, physician assistants, social workers, mental health care workers, and other personnel rendering medical care and treatment to Mr. Laskowski were acting as agents, servants, employees, ostensible agents, workmen, and/or representatives of Defendant United States of America, and were engaged in the course and scope of their employment or ostensible employment.

71. Defendant United States of America, as operator of the WBVAMC, owed duties and obligations to Plaintiffs to ensure that Mr. Laskowski's medical care and treatment was appropriate.

72. At all times material hereto, Mr. Laskowski was or should have been under the care, treatment, and attendance of Defendant United States of America, acting by and through the WBVAMC.

73. Defendant United States of America, acting by and through its agents, servants, employees, ostensible agents, representatives, and/or workmen, was grossly negligent in its treatment and care of Mr. Laskowski, both generally and in the following particular respects:

a.   Failing to supervise and monitor the treatment and care rendered to Mr. Laskowski while he was a patient in its facility when it knew or should have known that its staff did not possess the training, experience, skills, and judgment to treat properly Mr. Laskowski;

b.   Failing to ensure that Mr. Laskowski's treatment was in accordance with Defendant's policies and procedures when it knew or should have known that

its medical and nursing personnel were not properly treating Mr. Laskowski;

   c. Failing to train those providing treatment and care to Mr. Laskowski;

   d. Failing to properly and promptly treat the conditions from which Mr. Laskowski was suffering;

   e. Failing to prescribe appropriate medications, therapies, and follow up for Mr. Laskowski;

   f. Failing to consult with one or more physicians and/or specialists concerning Mr. Laskowski's symptoms, condition, care and/or treatment;

   g. Failing to schedule clinical visits and/or examinations prior to modifying Mr. Laskowski's treatment plan;

   h. Failing to provide any counseling services to Mr. Laskowski;

   i. Failing to respond to Mr. Laskowski's repeated calls for help;

   j. Failing to follow professional standards in determining whether Mr. Laskowski presented a serious danger of violence to himself or others;

   k. Failing to seek initiation of emergency or involuntary commitment proceedings;

l.   Failing to seek judicial intervention;

m.   Failing to seek mental health intervention;

n.   Failing to attempt to persuade Mr. Laskowski to submit to voluntary in patient treatment or commitment;

o.   Failing to adopt and/or enforce rules, regulations, and procedures to ensure proper medical care for Mr. Laskowski; and

p.   Failing to adopt and/or enforce rules, regulations, and procedures to ensure adequate and timely consultations with Mr. Laskowski.

74. As a direct and proximate result of the gross negligence and recklessness of Defendant, Mr. Laskowski suffered severe and disabling physical, psychiatric, and emotional injury, which injuries were foreseeable and will continue for an indefinite time into the future.

75. As a direct and proximate result of the gross negligence and recklessness of Defendant, Mr. Laskowski suffered a severe loss of his earnings and impairment of his earning capacity and power, all of

which injuries were foreseeable and will continue indefinitely into the future.

76. As a direct and proximate result of the gross negligence and recklessness of Defendant, Mr. Laskowski has suffered a diminution in his ability to enjoy life and life's pleasures, all of which injuries were foreseeable, are permanent, and will continue indefinitely into the future.

77. If Defendant were a private person, it would be liable to Plaintiffs for the foregoing under the law of the Commonwealth of Pennsylvania.

WHEREFORE, Plaintiff, Stanley P. Laskowski III seeks judgment against Defendant for damages in excess of $150,000 and such further relief as the Court deems just and appropriate.

### COUNT II – Loss of Consortium

### Marisol Laskowski v. United States of America

78. Plaintiffs incorporate by reference the allegations and averments set forth in paragraphs 1 - 77, as though set forth at length here.

33

79. At all times material hereto, Mrs. Laskowski was married to and residing with Mr. Laskowski.

80. As a direct and proximate result of the gross negligence and recklessness of Defendant, Mr. Laskowski has suffered severe and disabling physical, psychiatric, and emotional injury, which will continue for an indefinite time into the future.  Mr. Laskowski has also suffered severe loss of his earnings and impairment of his earning capacity and power, as well as a diminution in his ability to enjoy life and life's pleasures, all of which are permanent and will continue indefinitely into the future.

81. As a consequence of her husband's injuries, Mrs. Laskowski has lost the consort, companionship, society, affection, and support of her husband.

82. At the time of the infliction of the injuries to her husband, Mrs. Laskowski was present and

witnessed, among other things, his severe pain and suffering and incarceration.

83. At the time of the infliction of the injuries to her husband, Mrs. Laskowski was terror stricken and frightened and thereby received great and permanent mental suffering and nervous shock to herself.

84. By reason of, and as a direct and proximate result of the gross negligence and recklessness of Defendant and injuries to her husband, Mrs. Laskowski has lost the consort, society, companionship, affection, and support of her husband, and her own nervous system has been greatly injured. All of these injuries were foreseeable to Defendant.

85. If Defendant were a private person, it would be liable to Plaintiffs for the foregoing under the law of the Commonwealth of Pennsylvania.

35

WHEREFORE, Plaintiff, Marisol Laskowski seeks judgment against Defendant for damages in excess of $150,000 and such further relief as the Court deems just and appropriate.

Respectfully submitted,

/s/ John B. Dempsey
Daniel T. Brier (I.D. #53248)
dbrier@mbklaw.com
Patrick A. Casey (I.D. #50626)
pcasey@mbklaw.com
John B. Dempsey (I.D. #88017)
jdempsey@mbklaw.com

Attorneys for Plaintiffs,
Stanley P. Laskowski III and
Marisol Laskowski

Myers, Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, Pennsylvania 18503
(570) 342-6100

Date:  March 17, 2010

36

## CERTIFICATE OF MERIT

Pursuant to Pennsylvania Rule of Civil Procedure 1042.3, I, John B. Dempsey, hereby certify that claims are presented under subdivisions (a)(1) and (a)(2), and I further certify that:

> (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm; and

> (2) the claim that the defendant deviated from an acceptable professional standard is based on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard.

/s/ John B. Dempsey
John B. Dempsey

Date:  March 17, 2010