## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STANLEY P. LASKOWSKI, III** | : | **No. 3:10cv600** |
| **and MARISOL LASKOWSKI,** | : | |
| **Plaintiffs** | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA** | : | |
| **DEPARTMENT OF VETERAN** | : | |
| **AFFAIRS,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiffs Stanley and Marisol Laskowski initiated this action against the United States of America Department of Veterans Affairs for damages pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2671, *et seq.* The plaintiffs allege medical malpractice against the medical professionals and administrative staff at the Wilkes-Barre Veterans Affairs Medical Center ("WBVAMC") located in Wilkes-Barre, Pennsylvania. Plaintiffs assert that the United States of America Department of Veteran Affairs committed professional negligence in treating Plaintiff Stanley Laskowski for post traumatic stress disorder (hereinafter "PTSD") at the WBVAMC. Plaintiff Marisol Laskowski, Stanley Laskowski's wife, has asserted a claim for loss

of consortium.[1]

The government and the Laskowskis agree that Mr. Laskowski's valorous service to the country is not at issue. Nor is this case about Mr. Laskowski's PTSD diagnosis, the hardship this disease has caused Mr. Laskowski and his family, or Mr. Laskowski's current status as 100% disabled and unable to work in the American economy. The parties also agree that WBVAMC had a duty to care for Mr. Laskowski and that the WBVAMC violated this duty by failing to provide psychotherapy.

Although the government and the Laskowskis agree on much in this case, they disagree on whether the defendant breached other duties it owed to the plaintiffs in addition to its failure to provide psychotherapy. They also dispute two issues pertaining to causation. First, the parties dispute the cause of the severe, and apparently irreversible, worsening of Mr. Laskowski's mental disease from April 2007 to August 2007. Second,

---

[1]The Defendant in the instant case is the United States of America Department of Veterans Affairs. It is the operator of the WBVAMC and owed duties and obligations to ensure appropriate medical care was provided to Plaintiff Stanley Laskowski. (Doc. 62, Unidisputed Facts ¶ 75). During the relevant time, the United States undertook to provide healthcare services to veterans such as Plaintiff Stanley Laskowski and held itself out as a provider and institution equipped and "staffed to provide skilled and competent diagnosis and treatment of medical conditions" including PTSD. (Id. ¶¶ 9, 11). All the healthcare providers working at the WBVAMC and mentioned below acted as employees of the United States of America and were engaged in the course and scope of their employment in providing the treatment at issue in this case. (Id. ¶ 74).

2

the parties disagree as to whether the mental health professionals at the WBVAMC could have foreseen the decline in Mr. Laskowski's condition.

Plaintiffs contend that defendant's failure to provide proper PTSD treatment from April to August 2007 caused Mr. Laskowski's deterioration, and that any reasonably prudent mental health professional could have foreseen the mental decompensation that followed. In defense, the government would have the court shift all responsibility to Mr. Laskowski for his declining mental health. In so doing, the government asserts that Mr. Laskowski began inappropriate self-medication and that the shorthand comments of Veterans Affairs employees indicate that Mr. Laskowski underreported his symptoms.

This case demands that the medical records and live testimony be assessed in conjunction. The court finds, as will be explained below, that a preponderance of the evidence presented at trial establishes that the WBVAMC committed medical malpractice with respect to the care that it provided to Mr. Laskowski and that its medical malpractice caused his foreseeable injuries. Accordingly, the court will grant a verdict for the plaintiffs, and, in so doing, we note that this holding is unique to the facts presented before the court. We do not intend this decision to be a sweeping criticism of the defendant's treatment of veterans with PTSD. Rather, this case is very fact specific and we can make no comment on the

defendant's treatment of any other patients.

As noted above, Plaintiffs Stanley P. Laskowski, III and Marisol Laskowski instituted this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* (hereinafter "FTCA"). The plaintiffs filed this case on March 17, 2010 and the court held a seven-day non-jury trial beginning on September 10, 2012. In accordance with the court's directive, the parties have filed their respective post-trial submissions. The following constitutes the court's findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.[2]

**Jurisdiction**

Generally, the doctrine of sovereign immunity protects the United States from suit. The FTCA, however, waives this immunity for situations where negligent or wrongful acts or omissions of government employees, acting in the scope of their employment, cause injury to others. 28 U.S.C. § 1346(b)(1). The FTCA provides: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for

---

[2]Rule 52(a) provides: "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court."

punitive damages." 28 U.S.C. § 2674. The United States District Courts have jurisdiction over FTCA claims. 28 U.S.C. § 1346(b)(1).

The liability in such a situation is based upon the "law of the place where the act or omission occurred." Id. Here the alleged medical negligence took place in Wilkes-Barre, Pennsylvania. Accordingly, we will apply the substantive law of Pennsylvania. Regardless of the law of the place where the act or omission occurred, however, the parties are not entitled to a jury. 28 U.S.C. §§ 2402.[3]

**Standard of review**

Plaintiffs have the burden of proving their case by the preponderance of the evidence. Plaintiffs meet this burden when, in light of all the evidence, they establish that what they claim is more likely so than not so. Greenwich Collieries v. Dir., Office of Workers' Comp., 990 F.2d 730, 736 (3d Cir. 1993).

In determining whether any fact has been proven by a preponderance of evidence in the case, we have considered the testimony of all witnesses, both plaintiff witnesses and defense witnesses. We have also examined all exhibits received in evidence, whether presented by the

---

[3]Prior to bringing suit under the FTCA, a plaintiff must exhaust available administrative remedies. 28 U.S.C. § 2675. The parties agree that plaintiffs have exhausted their administrative remedies. (Doc. 62, Undisputed Facts at 3).

plaintiff or defendant.

**Background**

Plaintiff Stanley Laskowski was born on January 26, 1978 and graduated from Bishop O'Hara High School in May 1996. (Doc. 62, Undisputed Facts at ¶ 6).[4] He served most honorably in the United States Marine Corps between February 1999 and February 2007. In October 2002, he married Plaintiff Marisol Laskowski. They have four children and live in Carbondale, Pennsylvania. (Id.)

Plaintiff enlisted in the United States Marine Corps on February 23, 1999. (Id. ¶ 14). He rose to the rank of Sergeant. (Id.) In early 2003, plaintiff served as an infantry squad leader. He was deployed to Kuwait as a fire squad leader. (Id. ¶ 15). He took part in "Operation Iraqi Freedom," leading his squad "through fierce combat operations with valor and distinction." (Id. ¶ 17). Plaintiff received very favorable Fitness Reviews from his superior officers during this time. (Id. ¶¶ 17-19). The Marines awarded him the following medals and ribbons for his service: the Navy

---

[4]This case involves two plaintiffs Stanley Laskowski and his wife Marisol. Plaintiff Stanley has the principal cause of action, medical malpractice, and his wife Marisol has a derivative consortium claim. For purposes of clarity and simplicity, we will use the term "plaintiff" throughout to refer to Stanley Laskowski, unless we indicate otherwise. We will refer to Marisol as Plaintiff Marisol Laskowski. We will refer to them collectively as "plaintiffs."

and Marine Corps Achievement Medal with 1 star, the Marine Corps Good Conduct Medal with 1 star, the Combat Action Ribbon, the Iraq Campaign Medal, the Global War on Terrorism Service Medal, the Sea Service Deployment Ribbon with 1 star, and the National Defense Service Medal. (Id. ¶ 21).

During his service in Operation Iraqi Freedom, plaintiff proved himself valorous and courageous.  He also experienced the horror of combat.  (Id. ¶ 20).   Upon returning to the United States - and for four years thereafter - plaintiff remained in the Marine Corps and served as a Marksmanship Coach and Instructor at Parris Island, South Carolina.  (Id. ¶ 23).  He performed this job with distinction and continued to receive very favorable Fitness Reviews.  (Id. ¶¶ 22-26).

Plaintiff served in the Marine Corps for a total of eight years, and was honorably discharged in February 2007, at which time he and his wife moved to Northeastern Pennsylvania.  (Id. ¶ 26).   Plaintiff obtained a job as a financial advisor and sales associate for a company called Keystone Financial.  (Id. ¶ 27).

Upon leaving the Marine Corps, plaintiff was informed that he should contact his local Veterans Affairs Outreach Center to arrange for compensation and pension screenings regarding injuries he suffered while in the service.  (Id. ¶ 26).  To this end, he arranged for such screenings at

the Wilkes-Barre Outreach Center.  (Id. ¶¶ 28-29).   On April 11, 2007,

plaintiff arrived at the WBVAMC for his first compensation and pension

screening appointment.  During the appointment, plaintiff reported that he

had suffered from insomnia for two days, and he also reported other

symptoms consistent with PTSD.  He was told that he could go to the

Veterans Hospital emergency room for treatment.  (Id. ¶ 32).  On that

same day, he went to the emergency room, thus commencing the

treatment that would eventually lead to the instant lawsuit.  (Id. ¶ 33).

As this case involves allegations of medical malpractice, it is

important to review the medical treatment that plaintiff received in some

detail.  The relevant time period is between April and August 2007.  During

this time plaintiff visited the WBVAMC in person four (4) times.

Additionally, he telephoned the WBVAMC five (5) times and his wife

telephoned one (1) time.[5]   During all these months he was never treated

---

[5]The following is a summary of plaintiff's contact with the WBVAMC
during the relevant time frame:
1) 4/11/07, plaintiff saw Physician's Assistant Bernard Boroski in person
2) 4/20/01, plaintiff saw Francisco F. Santos, M.D., a psychiatrist, in
person, for a compensation and pension evaluation
3) 5/11/07, plaintiff saw Certified Nurse Practitioner Eugene Lucas, Jr., in
person
4) 5/17/07, plaintiff telephoned Physician Assistant Jennifer Pierce
5) 5/31/07, plaintiff telephoned Lucas
6) 6/04/07, plaintiff telephoned Lucas
7) 6/22/07, plaintiff telephoned Lucas
8) 7/03/07, plaintiff saw Lucas in person

by a physician at the WBVAMC, but dealt mainly with "physician extenders" –medical professionals such as nurses and physician assistants who are supervised by physicians and serve as caregivers to patients.[6]  We will review the medical treatment plaintiff received chronologically.

**April 11, 2007**

Plaintiff, at his wife's urging, sought treatment at the WBVAMC because he was having nightmares and difficulty sleeping.  (Doc. 68, Notes of Testimony (hereinafter "N.T.") 9/13/12 at 12).  Plaintiff presented himself at the WBVAMC Emergency Room on April 11, 2007.  A Triage Nurse, Mary J. Filipkowski, evaluated him.  Plaintiff reported his insomnia, and he screened positive for PTSD, depression and alcohol use. Filipkowski referred plaintiff to Physician Assistant (hereinafter "PA") Bernard Borowski who saw him on that same day.  (Doc. 62, Unidsputed Fact ¶ 33).

Plaintiff reported to PA Borowski that he had not slept for two days and that he had suffered from nightmares since 2003.  He told Borowski of a recurring nightmare and reported daytime irritability and isolation.  He also indicated that he had a history of substance abuse with alcohol and

9) 7/16/07, plaintiff telephoned Lucas
10) 7/18/07, Plaintiff Marisol Laskowski telephoned Lucas

[6]He did see a psychiatrist,  Dr. Santos, but this was for purposes of a compensation and pension evaluation not treatement.

drugs when he was eighteen to nineteen years old.  Borowski concluded that plaintiff had Adjustment Disorder with PTSD features.  (Id. ¶ 34).  He prescribed 25-50 mg of Trazadone for sleep.  (Id.)  Plaintiff specifically requested "talk therapy" on April 11, 2007; regardless, in the subsequent four months, the defendant did not provide "talk therapy" or psychotherapy. (Doc. 70, N.T. 9/17/12 at 56).

**April 17, 2007**

Kathleen Collelo-Minora, a Licensed Clinical Social Worker ("LCSW"), served as a Social Worker-Case Manager under the Department of Veterans Affairs VHA Handbook for the Transition Assistance and Case Management of Operation Iraqi Freedom ("OIF") and Operation Enduring Freedom ("OEF") Veterans and the Department of Veterans Affairs VHA Directive for the Role of VHA Points of Contact and Case Managers to Coordinate Care for Returning Combat Servicemembers and Veterans.  (Doc. 62, Undisputed Facts ¶ 35).

Collelo-Minora was responsible for coordinating the care and services provided to plaintiff.  To this end, she was required to review and coordinate his care, his needs and his access to services every thirty (30) days beginning on April 17.  (Doc. 68, N.T. 9/13/12 at 151).  Her job required that she establish and maintain an effective therapeutic relationship with OIF/OEF veterans so as to provide appropriate services to

the veterans and their families.  (Doc. 54, N.T. 9/11/12 at 179).  The defendant provided drug and alcohol counseling programs and a mental health clinic to veterans such as plaintiff.  Additionally, it had counseling services available for spouses of veterans such as Marisol Laskowski. (Doc. 54, N.T. 9/11/12 at 180).

Collelo-Minora's job included creating "a patient record flag which would identify each veteran when you went into their record as an OIF/OEF veteran." (Id. at 181).  In the instant case, the only action Collelo-Minora took was to make this patient record flag.  She did not conduct the requisite monthly follow ups or coordinate plaintiff's care as is provided for in the Department of Veterans Affairs VHA Handbook for Transition Assistance and Case Management of Operation Iraqi Freedom and Operation Enduring Freedom Veterans, the Department of Veterans Affairs VHA Directive for the Role of VHA Points of Contact and Case Managers to Coordinate Care for Returning Combat Servicemember and Veterans. (Doc. 62, Undisputed Facts ¶ 36).

**April 20, 2012**

On April 20, 2007, plaintiff met with Francisco F. Santos, M.D., Staff Psychiatrist Behavioral Services, for a Compensation and Pension examination.  Dr. Santos recorded that plaintiff "has sleep disturbance, avoids crowds, is hypervigilant, feels edgy every day, has moodiness and

11

outbursts of temper, feels depressed, low energy, has nightmares, intrusive recollections and anxiety." (Id. ¶ 37). Dr. Santos further noted that plaintiff "is showing persisting symptoms of avoidance, including suppression of the traumatic events and memories for years up until his discharge from the military." (Id.) He diagnosed plaintiff with Chronic PTSD and noted plaintiff's history of substance abuse." (Id. ¶ 37). Although Dr. Santos was authorized to treat Sgt. Laskowski's PTSD, he provided no medical treatment to him. He merely evaluated plaintiff for compensation and pension purposes. (Doc. 54, N.T. 9/11/12 at 8).

**May 1, 2007**

Plaintiff had a psychotherapy appointment scheduled for May 1, 2007 with Dr. Matthew Dooley, a clinical psychologist. (Doc. 70, N.T. 9/17/12 at 77). For reasons that are unclear, Plaintiff did not appear for the appointment. The WBVAMC staff should have notified Dr. Dooley of the missed appointment so he could contact plaintiff and reschedule it, but they did not. (Id.)

**May 11, 2007**

On May 11, 2007, Eugene Lucas Jr., a Certified Registered Nurse saw plaintiff. Nurse Lucas became plaintiff's primary care provider at the WBVAMC. On this initial visit, he noted that plaintiff had a history of alcohol and substance use with an occasional binge. Also he had a family

history of such use.  Plaintiff reported suffering disrupted sleep, hypnopomic and hypnogogic experiences relating to combat experience, impulstivity, nightmares, flashbacks, intrusive thoughts, irritability, anger, and anxiety.  Nurse Lucas confirmed Dr. Santos' diagnosis of Chronic PTSD and also diagnosed plaintiff with Depression.  (Doc. 62, Undisputed Facts at ¶ 38).

Lucas prescribed Clonazepam, a benzodiazepine, at .5 mg for sleep and Bruproprian at 100 mg in the morning for irritability and anger.[7]  Lucas further prescribed a follow-up visit in two months' time and had a note to refer Sgt. Laskowski to psychology for PTSD follow up.   Aruna Bhatia, M.D., co-signed the note regarding plaintiff's visit on the same day.  (Id. ¶ 39).   Dr. Bhatia served as a supervising physician or "collaborating physician" of Nurse Lucas.  She never met or treated plaintiff and evidently never discussed him with Nurse Lucas.  (Doc. 54, N.T. 9/11/12 at 121, 126).

The Clonazepam first prescribed to plaintiff on this visit would be the primary drug used by the WBVAMC to treat him.  Clonazepam is a

---

[7]As indicated, the parties' undisputed facts assert that plaintiff initially was prescribed .5 mg of Clonazepam.  The evidence presented at trial indicates that although he was prescribed a .5 mg tablet, he was instructed to break it in half and take a .25 mg. dose.   (See Doc. 57, N.T. 9/10/12 at 96-97; Doc. 77, Pl. Med. Records at 37; Doc. 91-123, Pl Ex. 95, Clonazepam Dosing Chart).

habituating drug as well as a disinhibiting drug.  A "disinhibiting drug" is one which "makes a person do things that they would not normally do."  (Id. at 24).   Nurse Lucas believed, incorrectly, that the WBVAMC supported the use of Clonazepam in PTSD patients. (Id. at 24)   When he prescribed it, Nurse Lucas was aware that Food & Drug Administration ("FDA") directed that addiction-prone individuals should be under careful surveillance when taking Clonazepam.  (Id. at 16).

**May 17, 2007**

The next contact plaintiff had with the WBVAMC was via the telephone.   He telephoned the Mental Health Hygiene Clinic on May 17, 2007 and spoke with Jennifer E. Pierce, a Physician Assistant.   Pierce had never seen or treated plaintiff prior to the call or afterwards.   (Doc. 62, Undisputed Facts ¶ 41).  Plaintiff reported that the Burproprion, which Lucas had prescribed for irritability and anger, made him feel very anxious like he wanted to put his head through a window.  (Doc. 67, N.T. 9/12/12 at 19).   During the call Pierce discontinued the Burproprion and prescribed Paxil (Paroxetene) instead.  Pierce scheduled no follow up at that time. No supervising physician co-signed Pierce's note regarding the treatment of plaintiff.  Nurse Lucas, however, did sign the note to acknowledge its receipt. (Doc. 62, Undisputed Facts ¶ 41).

**May 31, 2007**

Plaintiff's next contact with the WBVAMC was another telephone call.
Plaintiff placed this call on May 31, 2007. (Doc. 77, Pl. Trial Ex. 1(a) at
33). He reported that the Paxil made him feel like he was "crawling out of
his skin." He further complained about daytime anxiety. (Id.)   Lucas
discontinued the Paxil and doubled the dose of Clonazepam. (Doc. 54,
N.T. 9/11/12 at 12).   Nurse Lucas's supervising physician did not
countersign his note regarding this interaction with plaintiff. (Doc. 77, Pl.
Tr. Ex. 1(a) at 33).

**June 4, 2007**

Plaintiff again telephoned the Mental Hygiene Clinic on June 4, 2007
at which time he spoke with Nurse Lucas.   Lucas prescribed 0.5 mg
Clonazepam twice a day until plaintiff's scheduled appointment on July 3,
2007.  Nurse Lucas's supervising physician did not countersign his note
regarding this interaction with plaintiff.  (Doc. 62, Undisputed Facts ¶ 44).

**June 22, 2007**

Plaintiff called the Mental Hygiene Clinic on June 22, 2007 and spoke
with Nurse Lucas.  Lucas discontinued the daytime dose of Clonazepam.
(Id. ¶  47).   Because Clonazepam is habituating, decreasing the drug
dosage can cause withdrawal symptoms.  (Doc. 57, N.T. 9/10/12 at 15).
Plaintiff, however, did not receive any education or drug and alcohol

counseling when this dosage of Clonazepam was halved on June 22, 2007. (Doc. 54, N.T. 9/11/12 at 149; Doc. 68, N.T. 9/13/12 at 94).

Around this time, plaintiff began to self-medicate with improperly obtained Vicoden, a painkiller. (Doc. 62, Undisputed Facts ¶ 48). He started by taking two Vicoden a day and by August was taking up to eight daily. (Id. ¶ 50). He did not report taking Vicoden to his healthcare providers at the VA, although he insists that they never asked him. (Id. at 51). Additionally, plaintiff's alcohol consumption had steadily increased from April to July. (Id. ¶ 30).

**July 3, 2007**

Plaintiff had an appointment with Nurse Lucas on July 3, 2007 for medication and symptom management. Lucas continued the Clonazepam and prescribed another medicine, Buspirone. Lucas's supervising physician signed Lucas's note of this visit. (Doc. 62, Undisputed Facts ¶ 54). Plaintiff reported to Lucas that "I really would like to work on the anger and irritability during the day, but I am unsure what approach to take." (Doc. 77, Pl. Ex. 1(a) at 36). Lucas's note of the appointment indicated that plaintiff "continues with some irritability and anger. The patient also has some intrusive thinking during the day." (Id.) Lucas did not, however, ensure that plaintiff had been to psychotherapy to which he

had been referred.

**July 16, 2007**

Plaintiff telephoned the WBVAMC clinic again on July 16, 2007, and he spoke with Nurse Lucas. Plaintiff reported that he felt more irritable on the Buspirone medication. As a result, Nurse Lucas changed the medicines. He increased the dose of Clonazepam to 1.0 mg at the hour of sleep and 0.5 mg during the day. (Doc. 62, Undisputed Facts ¶ 55). Clonazapem does not treat the core symptoms of PTSD, however, it is the only medicine prescribed to plaintiff from July 16 through August 13, 2007. (Pl. Tr. Ex. 1(a), 33-35, 39-41; Doc. 57, N.T. 9/10/12 at 11, 15).

This telephone call was plaintiff's last contact with the WBVAMC during the relevant time frame. As of the date of the call, there was no treatment plan for plaintiff's PTSD. (Doc. 54, N.T. 9/11/12 at 113).

**July 18, 2007**

On July 18, 2007, Plaintiff Marisol Laskowski, telephoned Nurse Lucas at the WBVAMC. (Doc. 77, Pl. Ex. 1(a) at 41). Nurse Lucas noted that Marisol had concerns because plaintiff's irritability and anger had been escalating over the prior few weeks. (Doc. 62, Undisputed Facts ¶ 56) Marisol also reported that plaintiff was mixing alcohol with his medications. (Id.) Lucas suggested that Marisol encourage the plaintiff to come to the clinic as a "walk-in." (Id.) He also made a call to plaintiff's cellular

telephone, but did not reach him.  (Id.)  This telephone call is the last "treatment" received by plaintiff at the WBVAMC that is relevant to this action.

Thus, plaintiff's contact with the WBVAMC during the relevant time frame can be summarized as follows:

On April 11, 2007, plaintiff screened positive for PTSD and was seen by PA Boroski who prescribed Trazadone for sleep.  On April 20, 2007, plaintiff saw Dr. Santos for a compensation and pension evaluation.  Dr. Santos diagnosed plaintiff with PTSD but did not treat him.  Plaintiff visited Nurse Lucas on May 11, 2007 who confirmed the PTSD diagnosis and prescribed  Clonazepam, a benzodiazepine, at .5 mg for sleep and Bruproprian at 100 mg in the morning for irritability and anger.  Lucas also referred plaintiff to psychology for PTSD treatment.  This referral was never acted on by the WBVAMC.

After a phone call from plaintiff, on May 17, 2007, PA Pierce discontinued the Bruproprian and prescribed Paxil. On May 31, 2007, during a phone call with the plaintiff, Lucas discontinued the Paxil and increased the dosage of Clonazepam.  On June 4, 2007, plaintiff again telephoned Lucas. Lucas changed the dosage of Clonazepam. On June 22, 2007, after speaking with the plaintiff on the phone, Lucas again altered the Clonazepam prescription.  Prior to this date, plaintiff had been

taking a daytime and nighttime dose of the medicine. Lucas discontinued the daytime dose of Clonazepam on June 22.

Plaintiff had an in-person appointment with Nurse Lucas on July 3, 2007 where Lucas continued the prescription for Clonazepam and prescribed Buspirone. On July 16, 2007, plaintiff telephoned Lucas and indicated that the Buspirone made him more irritable. Lucas discontinued the Buspirone and again adjusted the dosage of the Clonazepam upward. That is all the contact plaintiff had with the healthcare providers during the relevant time frame.

In the early morning hours of August 13, 2007, plaintiff parked his car about six blocks away from the Family Pharmacy in Olyphant, Pennsylvania. (Doc. 62, Undisputed Facts, ¶ 63). Plaintiff was dressed in black and also had a black mask with him that he had made earlier. (Id. ¶ 64). He proceeded to the pharmacy, and threw a rock through its window. (Id. ¶ 63). He entered the pharmacy, grabbed some drugs, placed them in a backpack and exited the building. He made his way back to his car. (Id.) Later, the Olyphant Police Department arrested the plaintiff for burglary of

the pharmacy and related crimes.[8]  (Id. ¶ 65).  Keystone Financial

terminated plaintiff's employment after he was arrested.  (Id. ¶ 71).

On the night of his arrest, the police learned that plaintiff was a

combat veteran who was under treatment for PTSD. (Doc. 91-21, Tierney

Aff. ¶ 6). The Olyphant Police Department contacted the Veterans

Administration Mental Hygiene Clinic and spoke with Nurse Lucas.  (Doc.

62, Undisputed Facts ¶ 66).  The police requested inpatient treatment for

plaintiff at the defendant's facility.   The WBVAMC denied inpatient

treatment.  (Id.  ¶ 66).  Thus, the authorities incarcerated plaintiff in the

Lackawanna County Prison.  (Id. ¶ 70).

In August, plaintiff's stepmother spoke with Collelo-Minora, the social

worker assigned to plaintiff's case who had previously done nothing but

flag plaintiff as an OIF veteran.  Plaintiff's stepmother asked if plaintiff

---

[8]The Criminal Complaint charged the following: Burglary, 18 PENN.
STAT. CONS. ANN.  § 3502(a); Criminal Trespass, 18 PENN. STAT. CONS.
ANN. § 3503(a)(1)(ii); Theft by Unlawful Taking or Disposition, 18 PENN.
STAT. CONS. ANN. § 3921(a);  Receiving Stolen Property, 18 PENN. STAT.
CONS. ANN. § 3925(a); Possession of a Controlled Substance By a Person
Not Registered Under the Controlled Substance, Drug, Device and
Cosmetic Act, 35 PENN. STAT. 780-113(a)(16); Recklessly Endangering
Another Person, 18 PENN. STAT. CONS. ANN. § 2705; Loitering and
Prowling at Night Time, 18 PENN. STAT. CONS. ANN. § 5506; Firearms Not
To Be Carried Without A License, 18 PENN. STAT. CONS. ANN. § 6106(a);
Criminal Mischief, 18 PENN. STAT. CONS. ANN. § 3304(a)(2); Possessing
Instruments Of Crime, 18 PENN. STAT. CONS. ANN. § 907.  (Doc. 21,
Tierney Aff. ¶ 4).

could be transferred to the WBVAMC for inpatient care.  Again the request was denied.  (Id.  ¶ 69).  Collelo-Minora indicated that the prison system could provide appropriate mental healthcare.  (Id.)  The district attorney's office, however, agreed to a release plan that called for plaintiff's release from the prison and direct commitment to the PTSD clinic operated by the Veteran's Administration in Coatesville, Pennsylvania.  (Doc. 91-21, Tierney Aff. ¶ 7).  Finally, after spending forty-two days in jail, plaintiff was admitted into the Coatesville, Pennsylvania, Veterans Administration Medical Center, PTSD inpatient treatment program.  (Doc. 62, Undisputed Facts ¶ 71).

Ultimately, the district attorney exercised its prosecutorial discretion to provide accelerated rehabilitative disposition ("ARD") to the plaintiff.  (Doc. 91-21, Tierney Aff. ¶ 11).  He completed the ARD on May 8, 2010, and the court dismissed all charges against him on October 7, 2011.  (Id. ¶ 13).  The arrest and charges were then expunged from the plaintiff's record.  (Id. ¶ 14).

Currently, the Department of Veterans Affairs rates plaintiff as unemployable due to his PTSD.   They intend to review this classification in 2014.  (Doc. 62, Undisputed Facts ¶ 72).  Likewise, the Social Security Administration treats plaintiff as 100% disabled and unable to perform any job in the American economy.  (Id. ¶ 73).

Plaintiff subsequently instituted the instant medical malpractice action. The court held a seven-day non-jury trial beginning on September 10, 2012. The parties have filed their post-trial briefs and the matter is ripe for disposition.

**Discussion**

As noted above, the main cause of action in this case is medical malpractice, and under the FTCA, we must apply Pennsylvania state law. Pennsylvania courts have defined medical malpractice "as the 'unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services.'" Grossman v. Barke, 868 A.2d 561, 566 (Pa. Super. Ct. 2005) (citing Toogood v. Owen J. Rogal D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003)). To recover on a theory of medical malpractice under Pennsylvania law, the plaintiff must establish:

> (1) a duty owed by the physician to the patient
> (2) a breach of duty from the physician to the patient
> (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and
> (4) damages suffered by the patient that were a direct result of that harm.

Thierfelder v. Wolfert, 52 A.2d 1251, 1264 (Pa. 2012) (quoting Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990)).

In addition to these elements, the plaintiff in a medical malpractice case is "'required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.'"[9]  Estate of Keating ex rel. Keating v. Coatesville VA Med. Ctr., No. 11-4397, 2012 WL 3140915, at *2 (3d Cir. Aug. 3, 2012) (quoting Mitzelfelt, 584 A.2d at 892). We will address these issues separately.

### 1. Duty/Standard of Care

The government and plaintiff agree that the professional staff at the WBVAMC owed plaintiff duties and obligations to ensure that he received appropriate medical treatment.  (Doc. 62, Undisputed Facts ¶¶ 74-75). Thus, the first element needed to establish a medical malpractice claim is

---

[9]Pennsylvania courts have carved out a narrow exception to the requirement that medical malpractice plaintiffs employ expert witnesses. Expert testimony is not required when a matter "is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons."  Hightower-Warren v. Silk, 698 A.2d 52, 54 n.1 (Pa. 1997).  Instances in which expert opinions are unnecessary in a medical malpractice case are rare.  Simpson v. Fed. Bureau of Prisons, No. 3:02cv2313, 2005 WL 2387631, at *5 (M.D. Pa. Sept. 28, 2005) (citing Toogood, 824 A.2d at 1149.).  In the instant case, expert witness testimony was necessary and was provided.

satisfied.  The parties dispute, however, whether plaintiff established the applicable standard of care.  Plaintiff asserts that his expert witnesses, Dr. Robert Goldstein and Dr. Harvey Dondershine, sufficiently established the standard of care with respect to seven different aspects of PTSD treatment. (Doc. 75, Pls.' Proposed Findings of Fact & Conclusions of Law at 58-78).  Defendant argues, with a particular focus on the WBVAMC's pharmaceutical and telephone prescription practices, that plaintiff's experts have failed to establish the relevant standard of care.  (Doc. 74, Request for Findings of Fact & Conclusions of Law on Behalf of the United States of America at 46-47).

To better assess defendant's contention with respect to the sufficiency of plaintiff's experts' testimony, the court will briefly review the standard against which this testimony is to be measured.  The Pennsylvania Supreme Court explained the concept of "standard of care" as follows:

> The standard of care required of a physician or surgeon is well-settled. . . . A physician who is not a specialist is required to *possess* and *employ* in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man.  However, a physician or surgeon is not bound to employ any particular mode of treatment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method

24

> of treatment is recognized as proper, it is not negligence for the physician or surgeon to adopt either of such methods . . . .
>
> The burden of proof in a malpractice action is upon the plaintiff to prove either (1) that the physician or surgeon did not *possess* and *employ* the required skill and knowledge or (2) that he did not exercise the care and judgment of a reasonable man in like circumstances . . . .

Donaldson v. Maffucci, 156 A.2d 835, 838 (Pa. 1959)(citations omitted).

A specialist acting within his or her speciality is held to a higher standard. Specialists are "expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment" of diseases within that speciality. Pratt v. Stein, 444 A.2d 674, 708 (Pa. Super. Ct. 1982) (quoting McPhee v. Reichel, 461 F.2d 947, 951 (3d Cir. 1972)).

Plaintiff has the burden of proving that defendant's conduct fell below the standard of care owed to plaintiff. See Podlog v. United States, 205 F. Supp. 2d 346, 361-62 (M.D. Pa. 2002). Experts, however, need not use "magic words" when testifying as to the applicable standard of care. Maurer v. Trs. of the Univ. of Pa., 614 A.2d 754, 762 (Pa. Super. Ct. 1992) (citing Mitzelfelt, 584 A.2d at 894). Pennsylvania courts have consistently explained that "the standard of care in medical malpractice actions is first and foremost what is reasonable under the circumstances." Joyce v.

Boulevard Physical Therapy & Rehab. Ctr., P.C., 694 A.2d 648, 656 (Pa. Super. Ct. 1997) (citing Collins v. Hand, 246 A.2d 398 (Pa. 1968)).

Although the standard of care must be objective, an expert who relies on his or her years of practice and experience in a particular field can sufficiently establish the standard of care. Joyce, 694 A.2d at 655-56. An expert with extensive experience can even establish the relevant standard of care if he or she expresses an opinion in the first person and does not cite to treatises or medical periodicals. See id. In Joyce the Pennsylvania Superior Court assessed whether an orthopedic surgeon established the standard of care relevant to patient referrals to physical therapists. Id. The expert in Joyce, Dr. Ratner, testified that the defendant "should have discussed Mr. Joyce's case with the physical therapist or specified written instructions on the referral sheet." Id. at 656. The court noted that all orthopedic surgeons refer patients to physical therapists, and that "[i]t is well within the knowledge of an orthopedic surgeon, such as Dr. Ratner, to articulate an opinion upon the standard of care when referring patients to physical therapy." Id. The court specifically found that Dr. Ratner was competent to proffer such an opinion because he had thirty years of experience in the field of orthopedic medicine. Id. The court also found that "Dr. Ratner's use of the first person in describing the standard of care did not necessarily mean that he was presenting a personal opinion." Id.

26

In the instant case, plaintiff presented two expert witnesses at trial–Dr. Dondershine and Dr. Goldstein.[10]  Plaintiff asserts in his post-trial brief that his experts established the standard of care applicable to the PTSD care that the WBVAMC provided plaintiff and that the WBVAMC breached the relevant standard of care with respect to seven interrelated aspects of PTSD treatment.  Before turning our attention to plaintiff's allegation that defendant breached its duty, the court will assess whether plaintiff carried his burden and established the applicable standard of care with respect to the seven aspects of plaintiff's PTSD at issue.

First, plaintiff proffers that the standard of care for the treatment of PTSD requires psychotherapy.  (Doc. 75, Pls.' Proposed Findings of Fact & Conclusions of Law at 58).  This aspect of the standard of care for the treatment of PTSD is not in dispute.  Dr. Dondershine testified that plaintiff

---

[10]Harvey Dondershine, M.D., J.D., is a medical doctor board certified in psychiatry.  (Doc. 57, N.T. 9/10/12 at 3).  He has taught at Stanford Medical School in the Department of Psychiatry since the late 1970s.  (Id. at 4).  He was also a psychiatrist in the military where he dealt with patients suffering from the psychological injuries of war.  (Id.)  He also spent approximately twenty-five years working for the VA.  For twenty of those years he was the chief psychiatrist for the division of the National Center for PTSD in Menlo Park, California.  (Id. at 5).  He continues today to treat patients, including combat veterans with PTSD.  (Id.)  During the course of his career he has treated more than "2,000, perhaps 3,000" patients suffering from PTSD.  (Id. at 5-6).  The qualifications of Robert Goldstein, M.D. are addressed below in the section dealing with causation.

should have been referred to psychotherapy, (Doc. 57, N.T. 9/10/12 at 17), and defendant's expert, Dr. Glazer, agreed that the standard of care for PTSD treatment requires psychotherapy. (See Doc. 68, N.T. 9/13/12 at 47). Thus, plaintiff carried his burden and established the standard of care with respect to the need for psychotherapy.

Second, plaintiff maintains that the standard of care for the treatment of PTSD requires the application of the VA/Department of Defense Clinical Guidelines for the Management of Post-Traumatic Stress (hereinafter the "Guidelines"), informed by the sound clinical judgment, supervision and clinical experience. (Doc. 75, Pls.' Proposed Findings of Fact & Conclusions of Law at 60). Dr. Dondershine testified that, "[t]he guidelines have to be informed by supervision and by experience and keeping up with the literature, but it does reflect broad guidelines of what you do on step one and step two." (Doc. 57, N.T. 9/10/12 at 54). Moreover, Dr. Dondershine and counsel for defendant engaged in the following exchange at trial:

> Q. And the guidelines don't recommend a particular form of treatment. They are just recommendations, correct?
>
> A. Well, they have to be - - I would say when there is evidence - - depending on the level of evidence, because, you know, the guidelines, they say whether the evidence is good, medium or whatever. The stronger the evidence, the more you deviate only for a very good reason. They become stronger in their recommendations.

28

Q. The guidelines must always be applied in the context of a provider's clinical judgment for care of a particular patient, correct?

A. Correct.

Q. And they are meant to inform and support clinicians without constricting them, correct?

A. Correct.

(Id. at 102-03).

Dr. Goldstein similarly testified as follows:

The guidelines are not - - well, they are not compulsory in the sense that they are not, you know, legally mandated. They are not the same as the standard of care, but, you know, since they do put forth the best available state of the art evidence-based treatment practice at that time, anyone that chooses to exercise judgment to - - to depart from or deviate from these practice guidelines, pretty well damn better have a good medical justification for doing so, and in this case, I don't see there was any.

(Doc. 69, 9/14/12 Trial Tr. at 14).

The Guidelines strongly recommend Selective Serotonin Reuptake Inhibitors ("SSRIs") for the treatment of PTSD. (Doc. 91-1, P-Ex. 2, VA/DoD Clinical Practice Guidelines at I-5). The Guidelines also identify significant benefits from psychotherapy in the treatment of PTSD. (Id. at I-17). Defendant's expert, Dr. Glazer, provided an opinion which is similar to Guidelines recommendations. He stated that, "the best practice for PTSD treatment includes combination of S.S.R.I. and antidepressants like Paxil

and Zoloft - - and with cognition behavioral therapies designed for PTSD."
(Doc. 68, N.T. 9/13/12 at 91).

After reviewing the expert testimony and exhibits presented at trial, the court finds that plaintiff established the applicable standard of care for treating and maintaining PTSD.  Although the Guidelines are not legally mandated and do not represent the standard of care in an absolute sense, the evidence-based treatments strongly recommended in the Guidelines cannot be disregarded on a whim.  All of the experts who testified at trial agreed that clinicians should first consider the treatment recommendations contained in the Guidelines–SSRI medication with psychotherapy–prior to making an educated decision to deviate from that course.  The court notes that the methods described in the Guidelines are not experimental.[11]

_____

[11]Under Pennsylvania law, the plaintiff fails to carry the burden of establishing the applicable standard of care when the expert's testimony pertains to wholly experimental treatments.  See Maurer, 614 A.2d at 762-63.  In Maurer, the plaintiff suffered a brain injury that left him comatose for two months.  Id. at 756.  The plaintiff awoke and was treated by a neurosurgeon.  Id.  The plaintiff suffered complications, including the hardening of his joints.  Id.  The plaintiff initiated a medical malpractice action against his neurosurgeon in which he alleged, *inter alia*, that the neurosurgeon committed malpractice by failing to administer a drug called Didronel.  Id.  An *en banc* panel of the Superior Court of Pennsylvania found that the plaintiff failed to establish the standard of care as a matter of law.  Id. at 762-63.  The Superior Court held that plaintiff's expert was unable to articulate an applicable standard of care for the use of Didronel because, at the time plaintiff was treated, Didronel had not moved beyond the experimental phase.  Id.  As noted above, the treatment methods

Moreover, Dr. Dondershine and Dr. Goldstein, experts who each have

extensive experience treating combat-induced PTSD, offered the opinion

that the average clinician treating combat-induced PTSD patients should

be aware of the recommendations and evidence-based treatment practices

contained in the Guidelines.  These experts testified that clinicians should

only deviate from the evidence-based treatment practices strongly

recommended in the Guidelines in situations in which experience and

clinical judgment provides a compelling reason to do so.

Defendant argues that Dr. Goldstein and Dr. Dondershine's opinions

are at odds with respect to the standard of care under the Guidelines.

Defendant requests the following conclusions of law:

> 22.  Dr. Goldstein's testimony acknowledging that
> the Guidelines do not represent the standard of
> care, completely negated Dr. Dondershine's
> opinions that the medication choices were improper
> under the guidelines.
>
> 23.  It was Plaintiff's burden to provide the court
> with testimony identifying what the standard of care
> is, and they never did that, at least with respect to
> medication choices.
>
> 24.  Dr. Goldstein never provided the Court with
> what the standard of care was.  Therefore, without
> the benefit of knowing what the standard of care
> was, it is impossible for the court to determine
> whether the treatment and care was proper
> because we have nothing to compare it to.

---

described in the Guidelines are not experimental.

25.  As for Dr. Goldstein's testimony it provided this court with absolutely no guidance regarding why treatment was improper. . . .

27.  Dr. Goldstein's opinions were given in generalities.

(Doc. 74, Request for Findings of Fact & Conclusions of Law on Behalf of the United States of America at 46).

The defendant's proposed conclusions of law do not accurately reflect the facts or the law.  Although the court agrees that it is plaintiff's burden to establish the standard of care, the court disagrees with respect to the defendant's assessment of Dr. Goldstein's testimony.  Dr. Goldstein, like Dr. Dondershine, testified that the Guidelines, while not compulsory, put forth the best treatments known in psychiatry for PTSD.  The doctors also agreed that departure from the Guidelines is only warranted when the clinician finds a compelling medical justification for doing so.  Pennsylvania law allows an expert to offer an opinion on the standard of care in his or her own words, and an expert need not utter "magic words" to establish the applicable standard of care.  See Joyce, 694 A.2d 655-56; Maurer, 614 A.2d 754.  Moreover, the court finds that Dr. Dondershine's testimony, in itself, is sufficiently compelling to establish that the relevant standard of care requires the average clinician treating PTSD patients to be familiar with the recommendations contained in the Guidelines and only to deviate from them for compelling reasons.  The court is satisfied that this was the

relevant standard of care when the WBVAMC attempted to treat Mr. Laskowski for PTSD in 2007.

Third, plaintiff contends that the relevant standard of care for the treatment of PTSD requires "a nexus between the symptoms, the diagnosis, and the selected medications." (Doc. 75, Pls.' Proposed Findings of Fact & Conclusions of Law at 64). In other words, plaintiff asserts that diagnosis of a disease drives the treatment of that disease. Thus, the standard of care requires that a clinician treat a patient diagnosed with PTSD with those treatments which the clinician knew to be appropriate at that time based upon the patient's history. (Id. at 63-64).

At trial, when it comes to the need for diagnosis to drive treatment, Dr. Dondershine testified as follows:

> [I]f you have a toothache, you might take aspirin for the pain, but that will not handle the cavity. The issue is, is the symptom, the pain, a result of a condition, a diagnosis, and then what treatment do we know to give because of the diagnosis.
>
> We rely on the diagnosis and the history of it and how it is treated and what we know about it to plan the treatment.
>
> With respect to medications, there has to be a nexus between the symptoms, the diagnosis and the medications you pick; otherwise, you're [treating] in the dark.

(Doc. 57, N.T. 9/10/12 at 10). In the specific context of treating patients with PTSD, Dr. Dondershine testified that drugs such as benzodiazepines were acceptable to stabilize a patient in the short term. However, the use

33

of the drug over the long term to treat PTSD could aggravate the condition. (See id. at 15).

In light of Dr. Dondershine's testimony, and his decades of experience treating combat veterans with PTSD, the court finds that plaintiff has carried his burden to establish this aspect of the standard of care.  It is uncontested that the general precept that diagnosis drives treatment applies to mental health clinicians.  As such, the standard of care requires that clinicians prescribe medication or therapy that treats the core symptoms of PTSD.  At trial, the experts testified that, in certain circumstances, it is within the standard of care to prescribe drugs, such as benzodiazepines, to a PTSD patient to stabilize that patient over a short period of time.  As Matthew Dooley the staff psychologist at WBVAMC admitted at trial, Chronic PTSD does not improve absent treatment.  (Doc. 70, N.T. 9/18/12 at 69-70).  Thus, it is not within the standard of care to prescribe drugs intended for short term stabilization of PTSD patients for long term treatment when these drugs do not to treat the core symptoms of PTSD.

Fourth, plaintiff asserts that the applicable standard of care for the treatment of PTSD requires the coordination of care through communication and the creation of an interdisciplinary treatment team. (Doc. 75, Pls.' Proposed Findings of Fact & Conclusions of Law at 67).

With regard to this aspect of the standard of care for the treatment of

PTSD, Dr. Dondershine testified at trial as follows:

> The VA is a complex system. In many respects, the care was shared among different parties; therefore, everybody has to know what everybody else is doing.
>
> If a patient is seen in one clinic and given medicine that is bad for him in terms of another clinic, the clinician has got to know. If a person is referred for a treatment, you got to know if they got it. . . .
>
> The reason for medical electronic record is so that [supervisors] would know [what care physician extenders were providing]. The collaboration is not only person to person. It is often by the electronic records so everybody knows what everybody is doing, but as far as I can tell, it wasn't used and nothing was coordinated.

(Doc. 57, N.T. 9/10/12 at 16-17). On cross-examination, Dr. Glazer agreed

that PTSD care should be coordinated when he testified as follows:

> Q. You're aware that the V.A. had policies where they were supposed to flag and identify Iraqi war veterans for medical treatment?
>
> A. Correct.
>
> Q. Right, so your report says based on this guideline on or about May 17, 2007 it would have been Ms. Collelo's responsibility as case manager to coordinate the care and services of Mr. Laskowski right?
>
> A. That's my understanding.

(Doc. 68, N.T. 9/13/12 at 151-52). In light of the agreement among the

experts in this case, the court finds that plaintiff carried his burden to

establish the standard of care with respect to the need to coordinate the care PTSD patients receive.

Fifth, plaintiff contends that the relevant standard of care for the treatment of PTSD requires that physician extenders "must practice under the supervision of a physician who is responsible to be aware of the case, to provide education and to intervene, if necessary, for the welfare of the patient." (Doc. 75, Pls.' Proposed Findings of Fact & Conclusions of Law at 70). With regard to this aspect of the standard of care, Dr. Dondershine testified that Dr. Bhatia's responsibility in the instant case "was to supervise, was to be aware of [the] case, to provide education and to intervene, if necessary, for the welfare of the patient." (Doc. 57, N.T. 9/10/12 at 12). Moreover, with respect to the authority to prescribe medications, Dr. Dondershine testified that physician extenders are authorized to prescribe so long as they have adequate supervision. (Id. at 58). Regarding the role of physician extenders and the need for physicians to supervise them to ensure best practices, Dr. Dondershine testified as follows:

> The physician extenders are used when maybe they don't have enough doctors. Maybe they want the doctors only for the serious cases and to have the initial stuff handled by less trained, but that becomes even more important to have some oversight to when it is beyond that person's capacity and when someone else has to take over.

36

> There has to be some understandings. You don't give five-month prescriptions. You don't schedule two-month appointments. You don't change medications over the phone. I wouldn't change them over the phone.

(Id. at 59).

Plaintiff carried his burden and established the standard of care with respect to the need for physicians to supervise the care physician extenders provide to PTSD patients. Dr. Dondershine, an expert with many years of experience treating veterans in the VA system, testified that it is not within the standard of care for supervising physicians to ignore physician extenders. In other words, it is not within the standard of care to allow physician extenders a free hand to practice medicine and prescribe treatments to PTSD patients without supervision. Rather, the standard of care requires supervising physicians to oversee physician extenders and familiarize themselves with the patient's course of treatment set by the physician extender.

Sixth, plaintiff maintains that he carried his burden and established the standard of care relevant to treating PTSD patients over the telephone. Plaintiff specifically contends that the standard of care allows for the discontinuance of medication by telephone when the clinician believes the medication is harmful. But, this standard also requires that the clinician schedule a follow-up appointment to determine the efficacy of the decision to discontinue the medication. (Doc. 75, Pls.' Proposed Findings of Fact &

37

Conclusions of Law at 72). Furthermore, plaintiff contends that the relevant standard of care does not allow for the stopping of one prescription and prescribing a new drug over the telephone. (Id.)

When it comes to the treatment of PTSD over the telephone, Dr. Dondershine testified as follows:

> The problem there is that she didn't examine him. This was a phone call, and in a phone call, if there is an emergent medical problem, I can see stopping a medication if you think it is harmful, but then the patient has to be seen, because you may be wrong or the harm may continue, but to prescribe a new medicine to a patient you have never met, and indeed I think it was a two-month prescription of medicine, with no follow up or any idea whether that medicine will work, is fraught with peril, because there is just so much data you can get through a phone call.
>
> Part of what psychiatry does is use our senses. We look, as well as hear. So that, I think, is just something that is akin to Internet prescribing, and I teach residents they cannot prescribe new medicines on the phone to a person they have never known without a face-to-face examination.

(Doc. 57, N.T. 9/10/12 at 13). Dr. Dondershine explained that the standard of care forbids the prescription of new PTSD medications over the telephone, in part, because it is impossible to determine with certainty whether the patient is suffering because of an adverse reaction to his medication or a worsening of his PTSD. (Id. at 48-49). With respect to the problems posed by treating PTSD patients over the telephone, Dr. Dondershine explained:

> One of the problems with treating with people over the phone is that the disorder itself tends to avoid pain, and there has to be a structure within pain -- within which pain can be vented and shame and guilt and stories told. They just don't occur. It's the nature of the disorder.

(Id. at 143).

In light of Dr. Dondershine's convincing expert testimony on telephone medicine, the court finds that plaintiff carried his burden and established the standard of care relevant to treating PTSD patients over the telephone. Plaintiff established that all clinicians treating PTSD patients over the phone should observe two simple practices. First, with respect to stopping medications, it is within the standard of care for a clinician to instruct patients over the telephone to stop medications if a follow-up appointment is scheduled. Second, the standard of care requires that clinicians examine a patient in-person prior to prescribing new prescription medications; new prescription regimens should not be initiated over the telephone or internet.

The telephone, and its use to communicate with patients, is not novel or experimental. Dr. Dondershine explained which practices the psychiatric community believes to be safe and which are unsafe practices with respect to telephone medicine. He opined that telephone medicine cannot replace the important insights gained from in-person examinations. Dr. Dondershine based his testimony on the standard of care with respect

to treating PTSD patients over the telephone on his twenty-six years of experience treating PTSD patients in the VA system as well as his additional years teaching psychiatry students at Stanford Medical School. Although Dr. Dondershine drew on his personal experiences in forming his opinion, the court finds that Dr. Dondershine's testimony on the applicable standard of care was objective and that the standard of care he discussed applies to all clinicians treating PTSD patients.[12] Moreover, given Dr. Dondershine's testimony and extensive experience treating patients with combat-induced PTSD, the court is not persuaded by the testimony of defense expert Dr. Glazer that the standard of care allows for the prescription of new medications over the phone during short and superficial calls. The court is especially skeptical of Dr. Glazer's testimony on the appropriateness of treating PTSD patients by telephone given his specialization in a subtopic of schizophrenia and **not** combat-induced PTSD. (Doc. 68, N.T. 9/13/12 at 43, 87-88, 118-19).

_____

[12]The court notes that Dr. Bhatia testified that the WBVAMC had a policy of keeping telephone calls with PTSD patients "very superficial" because asking PTSD patients probing questions, as would be done in a counseling session, could cause the patient to decompensate. (Doc. 54, N.T. 9/11/12 at 131-32). Dr. Bhatia's admission that it is difficult to ascertain the information necessary to make an informed pharmaceutical decision over the telephone appears to corroborate Dr. Dondershine's testimony regarding the standard of care relevant to the treatment of PTSD patients over the telephone.

In its proposed conclusions of law, defendant requests the following with respect to the standard of care applicable to treating PTSD patients over the telephone:

> 36. Dr. Goldstein never mentioned anything about various phone calls and what standard of care was in the community.
>
> 37. Dr. Dondershine, never established what the standard of care was regarding phone calls. What he did say, is that he advises his students at Stanford University, which is in California, to stay away from phone medicine.
>
> 38. What Dr. Dondershine teaches the students in a classroom at Stanford is irrelevant, the standards that need to be applies are the ones here in Pennsylvania where the medical providers are practicing.

(Doc. 74, Request for Findings of Fact & Conclusions of Law on Behalf of the United States of America at 47). The court disagrees with defendant's assertion that Dr. Dondershine did little more than state a personal opinion that he holds in the classroom. Rather, as is fully explained above, Dr. Dondershine stated the standard of care relevant to the entire psychiatric community when it comes to treating PTSD patients over the phone. The fact Dr. Dondershine instructs his students in this standard of care at Stanford does not render this standard inapplicable to VA clinicians in Pennsylvania. See Joyce, supra.

Finally, plaintiff asserts that he carried his burden and established a seventh aspect of the relevant standard of care. Specifically plaintiff contends that the standard of care requires the monitoring of PTSD

41

patients with known alcohol and substance abuse co-morbitities.  (Doc. 75,

Pls.' Proposed Findings of Fact & Conclusions of Law at 77).  When asked

at trial about the significance of plaintiff's positive alcohol screen, Dr.

Dondershine answered that veterans with combat-induced PTSD who

exhibit a pattern of binge drinking need to be monitored.  (See Doc. 57,

N.T. 9/10/12 at 23).  With respect to the need to monitor PTSD patients on

benzodiazepines in particular, Dr. Dondershine testified as follows:

> Because PTSD, you can self-medicate with alcohol, because
> benzodiazepines are bad drugs to give to people with an
> alcohol problem, and also what happens is if you don't treat the
> PTSD, it gets worse and the patient will resort to self-
> medicating.  So it is something to be alert to and monitor.

(Id. at 41).  The Physicians' Desk Reference similarly provides that

"[a]ddiction-prone individuals (such as drug addicts or alcoholics) should

be under careful surveillance when receiving Clonazepam or other

psychotropic agents because of the predisposition of such patients to

habituation and dependence."  (Doc. 91-23, P-Ex. 96, Physicians' Desk

Reference at 3).

Despite the expert testimony presented by Dr. Dondershine, and the

material from the Physicians' Desk Reference, the court finds that plaintiff

has not carried his burden and established this aspect of the standard of

care for patients with PTSD.  As presented by the plaintiff, the standard is

not specific, but merely requires that clinicians "monitor" PTSD patients

42

with a history of drug and alcohol abuse for signs of self-medication. Plaintiff asserts that monitoring is especially needed when the PTSD patient has been prescribed a habituating drug such as a benzodiazepine. Plaintiff has presented no evidence of the type of monitoring that is necessary. Moreover, the evidence presented to establish a breach of this aspect of the standard is not convincing. Plaintiff merely cites to a portion of Nurse Lucas's testimony where he states that he was not providing surveillance of the plaintiff while he was under his care. (Doc. 54, N.T. 9/11/12 at 18-19). We find this standard and the evidence to support it to be too nebulous to support liability on the part of the defendant. Practically speaking, our conclusion with respect to this portion of the standard of care has no effect on the case because, as discussed below, we find that the other portions of the standard of care were in fact breached by the defendant and these breaches caused harm to the plaintiff.

## 2. Breach

In addition to establishing the standard of care that the defendant owed, plaintiff has also established a breach of the standard of care. We will address each breach as it corresponds to the specific aspects of the standard of care discussed above.

First, the parties agree that the defendant had a duty to provide psychotherapy to the plaintiff. They also agree that they breached this

43

duty.  (Doc. 68, N.T. 9/13/12 at 47) (defense expert admitting that failure to properly refer plaintiff to the psychology department was a breach of the standard of care).

Next, the plaintiff established that the standard of care for the treatment of PTSD requires the application of the Guidelines informed by sound clinical judgment, supervision and clinical experience.  Plaintiff has established a breach of this standard of care.  Nurse Lucas's treatment of plaintiff was not informed by the Guidelines because Nurse Lucas was not familiar with them.  (Doc. 54, N.T. 9/11/12 at 52-55).  He was also unaware of the PTSD checklist contained in the Guidelines where a patient can write down how he feels on his visits.  (Id. at 55-58).   The defendant breached the standard of care by not ensuring that one who was treating patients with PTSD was aware of the Guidelines and providing treatment accordingly.  Further, the defendant failed in the supervision of Nurse Lucas by allowing him to prescribe a drug not approved by the United States FDA without authorization of a collaborating physician. (Id. at 32-33).  Although Clonazepam is not FDA approved for treatment of PTSD, Nurse Lucas wrote plaintiff prescriptions for it on May 31, June 4 and June 22, 2007.  (Id. at 22, 33).  He wrote these prescriptions without approval of a collaborating physician.  (Id. at 33).  For all these reasons, we agree that defendant violated the standard of care with regard to treating PTSD

through the application of the Guidelines informed by sound clinical judgment, supervision and clinical experience.

Plaintiff also established that the standard of care requires a nexus between the chosen medication and the diagnosis.  In other words, diagnosis of a disease drives the treatment of that disease, and that the standard of care requires that a clinician treat a PTSD patient based upon the patient's history of PTSD and the treatment that clinician knew to be appropriate at that time.   In the instant case, Nurse Lucas prescribed Clonazepam, a benzodiazepine, to the plaintiff.  Defendant established through Dr. Dondershine that it breaches the standard of care to prescribe Clonazepam to a patient like the plaintiff who suffered from Chronic PTSD, had a history of drug and alcohol abuse and known active alcohol use with occasional binge drinking.  (Doc. 57, N.T. 9/10/12 at 11, 15).  Specifically, Dr. Dondershine testified with regard to the use of a benzodiazepine from April 11 through July 2007 for the treatment of plaintiff's PTSD:

> I think it was not appropriate. . . . It was not appropriate to use that in this case in that way. . . . If there's an acute stress disorder and an accident just happened, it is okay to use a drug like benzodiazepine for three to five days, but not longer because it could actually aggravate the condition.
>
> Coming to this case, which is one of chronic PTSD that was enduring already, benzodiazepines are known not to decrease any of the core symptoms of PTSD.  They are a particular problem because they can disinhibit, like taking a drink of alcohol.

45

> They are also habituating.  So once the person gets
> used to it, decreasing it can cause problems
> because they can have withdrawal problems.

(Doc. 57, N.T. 9/10/12 at 15).[13]  Thus, the required nexus between the

chosen medication and the diagnosis is not present here.

Similarly, both the plaintiff's expert witness and the defense expert

witness agreed that it is a deviation from the standard of care to prescribe

Clonazepam to treat the core symptoms of plaintiff's PTSD.  (Doc. 57, N.T.

9/10/12 at 15) (plaintiff's expert Dr. Dondershine indicating that the use of

Clonazepam was inappropriate); Doc. 68, N.T. 9/13/12 (defense expert Dr.

Glazer indicating that it is not his opinion that it was within the standard of

care to treat the core symptoms of PTSD with Clonazepam).  In the instant

case, it is undisputed that the defendant treated plaintiff with Clonazepam

for several months.   In fact, it was the sole medicine prescribed to the

plaintiff from May 31 to July 3 and from July 16 to August 13.  (See Doc.

78, Pl. Ex. 1(a), Medical Records).

Nurse Lucas indicated that he was aware that the FDA did not

approve using Clonazepam to treat PTSD (Doc. 54, N.T. 9/11/12 at 22).

He believed that the VA approved of the use of Clonazepam for the

treatment of PTSD.  (Id. at 22-24).   The VA, however, indicated that such

---

[13]A disinhibiting drug can cause a person to do things that they
normally would not do.  (Doc. 54, N.T. 9/11/12 at 24).

46

medicine had "no benefit/no harm" in the treatment of PTSD. (Doc. 91-1, Pl. Ex. 2 at I-5). Indeed, the Coatesville VA Hospital indicated that its PTSD program "in compliance with VA policy, does not support the use of benzodiazepines in the treatment of PTSD . . . . Please ensure that if benzodiazepines have been prescribed, their use is discontinued prior to the veteran's arrival." (Doc. 81, Pl. Ex. 28 at 41). Accordingly, we conclude that plaintiff has established that defendant violated the standard of care with regard to a nexus between the chosen medication and the diagnosis.

The next standard of care established by the plaintiff is the requirement for coordinated care. The applicable standard of care for the treatment of PTSD requires the coordination of care through communication and the creation of an interdisciplinary treatment team. The defendant breached this standard of care in several ways. First, there was no coordination or discussion of plaintiff's care amongst the various medical provides, Collelo-Minora, Borowski, Lucas, Pierce, Santos and Bhatia.

The second breach is Collelo-Minora's failure to perform appropriate case management or supportive services for plaintiff or his family. (Doc. 68, N.T. 9/13/12 at 152-53). Also, plaintiff's medical providers, Lucas, Pierce, Bhatia and Santos, violated the standard of care by failing to

47

effectuate plaintiff's referral to psychotherapy. (Id. at 154-56). Pierce, Bahtia and Santos also violated this standard by failing to refer plaintiff to psychotherapy themselves. (Id. at 155).

Plaintiff also established that the standard of care permitted defendant to use physician extenders like Lucas and Pierce. The standard requires however, that they practice under the supervision of a physician who must be aware of the case, provide education and intervene when necessary for the patient's welfare. Dondershine testified that the defendant deviated from the standard of care by not sufficiently supervising the treatment Lucas and Pierce provided to plaintiff. (Doc. 57, N.T. 9/10/12 at 12). For example, Lucas generally treated plaintiff without consultation with the supervising physician. (Doc. 54, N.T. 9/11/12 8-9, 14). He started new medicines, stopped medicines and doubled and tripled the dosages of patient's medicines without discussion or approval of a supervising physician.

As set forth above, Dr. Dondershine established the standard of care with regard to practicing medicine over the telephone. He also has established the breach of this standard. The standard does not permit Pierce's actions of stopping one prescription and starting a new one over the telephone without seeing the patient and with no folllow-up. (Doc. 57, N.T. 9/10/12 at 12-13). Additionally, Lucas breached the standard of care

48

during three phone calls from the plaintiff on May 31, June 4, and June 22. He did not question plaintiff in any significant detail regarding his PTSD symptoms, but he discontinued one medicine and increased and decreased another.  (Id. at 14-15).  He did all this while complying with a rigid rule of a two-month appointment schedule.  That is, he did not ask plaintiff to come in for an earlier appointment despite the repeated phone calls and problems plaintiff was reporting.   (Id. at 14).

Based upon all of the above, especially the convincing testimony of plaintiff's expert witnesses, we find that the defendant breached the standard of care in several ways.

### 3.  Causation

Because we have found a duty and breach of that duty by the defendant, we must next determine whether that breach caused harm to the plaintiff.  Thierfelder, 52 A.2d at 1264.  Generally, in a medical malpractice action, a plaintiff needs expert testimony to establish causation.  Grossman v. Barke, 868 A.2d 561, 566 (Pa. Super. Ct. 2005).  "[L]aypersons generally [lack] the knowledge to determine the factual issues of medical causation[.]"  Id.  at 567.

In the present case, plaintiff provided the expert witness testimony of Robert L. Goldstein, M.D., to establish causation.  (Doc. 69, N.T. 9/14/12 at 3-19).  Dr. Goldstein is an expert in the field of psychiatry and the

49

treatment and care of PTSD.  (Id. at 3).  Dr. Goldstein is board certified in psychiatry.  (Id. at 5-6).  He served for the past twenty years as a clinical professor of psychiatry at the College of Physicians and Surgeons at Columbia University.  (Id. at 3).  For the fifteen years before that, he served on the faculty of New York University Medical School in Manhattan.  (Id. at 2).  His main professional activity at this time is in the full-time practice of psychiatry and treating patients.  (Id. at 4).

More specifically relevant to this case, for six years in the late 1970s and early 1980s, Dr. Goldstein served as the director of the outpatient psychiatry service at the New York Veterans Administration Medical Center.  (Id. at 4-5)  For two and a half of those years, he was also the director of inpatient service.  (Id. at 5).  During his tenure at the VA he treated well over one thousand veterans suffering from PTSD.  (Id. at 6).  He also treated PTSD patients over the years in his private practice.  (Id. at 7).  The defendant stipulated to Dr. Goldstein's qualifications, and he was accepted at trial as an expert.  (Id. at 3).

Dr. Goldstein provided the following conclusions: Plaintiff is totally and permanently disabled since prior to August 2007.  (Id. at 7).  When he arrived at the VA in April 2007, plaintiff would have benefitted from psychotherapy and proper medical therapy that the VA had available.  (Id. at 10).  At that time he was a high functioning individual without any prior

50

history of psychiatric treatment, and he had a very good prognosis for substantial improvement or complete recovery. (Id. at 11).  Further, Dr. Goldstein opined that it was foreseeable that plaintiff would begin self-medicating with Vicodin.  (Id. at 12).  Plaintiff never received the appropriate treatment for worsening PTSD symptoms, and in such patients it is highly foreseeable, and very highly probable, that the patient will resort to self-medication and develop an addiction or habituation habit.  (Id.)  The defendant prescribed a benzodiazepine, Clonazepam, to plaintiff.  At the time in 2007, it was recognized that such medications could kick off another bout of addiction and self-medication with addictive behavior in patients with a history of prior substance abuse.  Thus, it was to be prescribed with caution to patients with such a history.  (Id. at 13).  Here, not only did the VA not provide proper PTSD treatment, but they administered a medication that would result in self-medication with an addictive substance.

The VA has developed drug and alcohol counseling and education programs for people with a history of substance abuse.  The defendant never recommended such programs for the plaintiff.  (Id.)  In fact, the defendant failed to implement an appropriate treatment plan for the control and management of plaintiff's PTSD.  (Id. at 17).

Accordingly, plaintiff has established that the defendant failed to provide him with appropriate treatment between April and August 2007. This failure is directly, causally and foreseeably related to plaintiff's disability.  (Id.)  The defendant could have foreseen and predicted that its failure to treat plaintiff appropriately would lead to self-medication, substance abuse, and a substantial risk of impulsive, reckless, self-destructive and possibly violent behavior.  (Id. at 16).

If the defendant had provided appropriate standard of care treatment, plaintiff's prognosis for substantial improvement or complete recovery was very good.  (Id. at 10).  However, the defendant's failure to provide such treatment increased the risk that plaintiff would become permanently disabled and this increased risk was a substantial factor in causing plaintiff's harm.  (Id. at 18).   If plaintiff's condition had not gotten worse, but had remained the same as when he presented himself to the defendant, he would have continued to function normally, and work.  (Id. at 14).  Unfortunately, however, defendant's actions did cause plaintiff's condition to worsen.

We conclude that the plaintiff has established the causation between the defendant's breaches of the standard of care and the harm that has been caused to the plaintiff.  In other words, defendant has caused plaintiff

to be permanently disabled due to its failure to provide appropriate treatment for plaintiff's PTSD between April and August 2007.

## 4. Damages

The final aspect of plaintiff's medical malpractice action is damages. The purpose of providing damages under the FTCA is to compensate the plaintiff for his losses. Barnes v. United States, 685 F.2d 66, 69 (3d Cir. 1982). "The purpose of personal injury compensation is neither to reward the plaintiff, nor to punish the defendant, but to replace plaintiff's losses." Id. (quotation marks and citation omitted). Thus, several different types of damages are available to the plaintiff. Plaintiff can recover for economic damages, which include his past earnings loss and his future loss in earnings. See PA. R. CIV. PRO. 1042.71. Additionally, he can recover for both past and future non-economic damages for matters such as the pain and suffering he endured due to the defendant's negligence. Id. We will address the economic damages and the non-economic damages *in seriatim*.

A. Economic harm

As noted above, plaintiff's economic harm claim is broken into past lost earnings and future loss in earnings. We will discuss each separately.

1.  Past Lost Earnings

The plaintiff called two expert witnesses in support of his economic damages claims, a vocational expert and an economist.  We will briefly discuss their qualifications and their testimony regarding plaintiff. The parties stipulated to the expert witness qualifications of Patricia Chilleri, a vocational expert.  (Doc. 69, N.T. 9/14/12 at 20).   Chilleri has a bachelor of science degree in psychology and human service as well as a master of science degree in rehabilitation counseling.  Since 1981, she has worked in the field of vocational rehabilitation.  She works to help people who have physical, cognitive or emotional disabilities develop a rehabilitation plan and reintegrate back into the work world.  (Id.)  She meets and evaluates individuals with disabilities to determine their residual employability and earning potential.  Additionally, she is under contract with the federal government as a vocational expert for the Social Security Administration. (Id.)

In the instant case, she performed a residual employability assessment of plaintiff.  (Id. at 21).  She found that the handicap that the plaintiff's disability poses in the work setting is extreme because Dr. Goldstein determined that from a medical standpoint that plaintiff has total and permanent disability.  (Id.)  She concluded that plaintiff suffers from a total vocational disability.  (Id. at 36-37, 43).  In other words plaintiff's

"economic horizons are stopped." (Id. at 43). Without the disability that he suffered, Chilleri opined that plaintiff would have continued and been successful as a financial advisor. (Id. at 41). The median annual wage of financial advisors in the Scranton/Wilkes-Barre area is $61,360 and the experienced annual wage is $85,210. (Id. at 42). When the salary statistics are examined for the whole state it reveals a median annual wage of $67,470 and an experienced annual wage of $111,600. (Id.) Additionally, Chilleri provided an alternative profession pursuant to a transferable skills analysis. (Id. at 43). If plaintiff had sought out alternate employment, he had skills directly transferable to the occupational classification of "training and development manager." (Id.) In the Scranton/Wilkes-Barre area this occupation has a median wage of $97,430 and an experienced wage of $109,500. For the entire state of Pennsylvania, these amounts are $98,370 and $122,600. (Id.)

In conclusion, Chilleri opined that plaintiff lacked the prerequisites to maintain competitive employment in today's labor market. Based upon Dr. Goldstein's prognosis and diagnosis, she also opined that plaintiff is precluded from meeting the standards of competitive gainful employment. (Id. at 44).

Also testifying regarding plaintiff's economic damages was plaintiff's final witness, Andrew Verzilli, an economist. (Id. at 55). Verzilli has been

an economist for twenty-two years providing analysis and opinions

regarding the manner in which events affect one's ability to earn income.

(Id.)  He testified regarding the plaintiff's lost earning capacity, which is an

estimation of earnings plaintiff would have made had the medical

malpractice not occurred.  (Id. at 56).  Verzilli examined plaintiff's

"economic horizons and had this event not occurred what was [his]

opportunity to produce income based on [his] skills and talents, to some

extent, [his] actual experience as well as [his] education and training."  (Id.

at 57).  He reviewed the following in making his calculations:  the

vocational report of Patricia Chilleri, plaintiff's income tax returns for the

years 2004-2009, plaintiff's VA benefit statements, IRS/PA tax tables and

various publications and source documents.  (Doc. 91-23, Pl. Ex. 107).

Verzilli computed plaintiff's past earnings loss for Securities/Financial

Sales position at $214,582.[14]  Verzilli computed also calculated a future

---

[14]An offset for the amount of veteran's benefits plaintiff has already
received is reflected in this amount.  (Doc. 91-23, Pl. Ex. 108).  Such a
setoff is provided for under 40 PENN. STAT. § 1303.508(a) (providing that a
plaintiff in a medical malpractice action cannot recover damages for past
lost earnings to the extent that the loss is covered by a private or public
benefit that claimant received prior to trial.)  Verzilli also computed past lost
wages for plaintiff with regard to the occupation of Training/Development
Manager.  (Id.)  We have chosen to proceed with the computation with
regard to the Securities/Financial Sales position as that is the career
plaintiff was pursuing at the time that he became permanently disabled.
Verzilli made two calculations of the future earnings loss, one based on a
wage growth of 3% and one based on a wage growth of 3.5%.  (Id.)  We

loss in earnings at $2,144,803. (Id., Doc. 64, Stipulation Regarding Economic Damages ¶¶ 5, 8). Thus, the total of the past and future loss of earnings as explained by Verzilli is $2,359,385.

2. Non-economic damages

The second facet of damages available to the plaintiff is non-economic damages. Non-economic damages are provided to compensate the plaintiff for pain and suffering, embarrassment and humiliation; loss of ability to enjoy the pleasures of life and disfigurement. Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys., 903 A.2d 540, 555 (Pa. Super. Ct. 2006) (quoting PA. R. CIV. PRO. 223.3). In determining the non-economic damages we consider "the age of the plaintiff, the severity of his or her injuries, whether the injuries are temporary or permanent, the duration and nature of medical treatment, the duration and extent of physical pain and mental anguish on the part of the plaintiff, and the plaintiff's . . . condition before the injuries." Gillingham v. Consol Energy, Inc., 51 A.3d 841 (Pa. Super. Ct. 2012). As set forth above, plaintiff has had significant "pain and suffering" due to the defendant's malpractice. Our verdict will contain an amount sufficient to compensate him for this pain and suffering.

―――――――――――――――

have chosen to use the calculation based on a wage growth of 3%.

57

Defendant raises three other issues which it claims should reduce the amount of damages available in the instant case.  Those issues are comparative negligence, set off and public policy.  We find no merit to the defendant's remaining arguments, but we will address them all nonetheless.

### 5.  Comparative negligence

Defendant argues that the plaintiff's own negligence should reduce the amount of damages to which he is entitled.  Generally, we agree that a plaintiff's award of damages should be reduced by the amount of his own negligence.

> The law provides as follows:
>
> > In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

42 PENN. CONS. STAT. ANN. § 7102.

According to the government, plaintiffs own negligence includes the following: 1) self-medicating with alcohol and illegal drugs; 2) failing to tell medical providers of the self medication; and 3) failing to be honest and

open about symptoms including not informing Nurse Lucas that he wanted to "jump off a roof" or "blow his brains out."  (Doc. 74, Def's Requested Conc. of Law ¶ 58, at p. 50).

We are unconvinced by the government's argument.   The testimony at trial revealed that plaintiff was initially a good patient and actively seeking help from the VA.  The VA did not provide the help and medical treatment needed by the plaintiff, and as a result, plaintiff began self-medicating with alcohol and illegal drugs.  The fact that plaintiff self-medicated and failed to inform the medical providers of it was caused by the government's own failure to treat him.  Accordingly, the government's liability should not be reduced.

### 6.  Set off for future benefits

As noted above, the VA has rated plaintiff as totally disabled and pays him a monthly disability benefit.  The government will reevaluate the plaintiff in 2014 to determine if he continues to be disabled under their rules and therefore entitled to further disability benefits.  The government seeks a credit for past and future VA disability compensation benefits that it has paid or will pay the plaintiff in the future.  The plaintiff appears to agree with a set-off for the benefits already paid, however, it  argues that a set-off for non-guaranteed future monthly disability benefits is

inappropriate.  After a careful review, we agree with the plaintiff that a set-off for non-guaranteed future monthly disability benefits is inappropriate.

First we note, that under Pennsylvania law, a plaintiff must prove damages to a "reasonable certainty."  <u>Barnes</u>, 685 F.2d at 69.  Once a plaintiff has established damages to a reasonable certainty, if the defendant seeks to then lower the amount of damages it must produce evidence to demonstrate the proper reduction.  <u>Id.</u>  The reason for this rule is that "the risk of uncertainty should be placed on the wrongdoer, rather than the innocent party."  <u>Id.</u>  In light of this standard, we turn to the law with respect to the collateral source rule.

Generally, Pennsylvania  applies the collateral source rule, which allows a plaintiff to recover from a defendant as well as another, independent source, such as an insurance policy.  <u>See</u> <u>Johnson v. Beane</u>, 664 A.2d 96, 100 (Pa.1995) (citing <u>Beechwoods Flying Serv., Inc. v. Hamilton Contracting Corp.</u>,  476 A.2d 350 (Pa.1984)). The principle behind this rule is that "it is better for the wronged plaintiff to receive a potential windfall than for a tortfeasor to be relieved of responsibility for the wrong." <u>Id.</u>

In our case, however, the payments at issue are from the tortfeasor, not an independent source such as an insurance policy.   The law provides that "a payment made by a tortfeasor or by a person acting for him to a

60

person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability." Moorehead v. Crozer Chester Med. Ctr., 765 A.2d 786, 788 n.3 (Pa. 2001) (abrogated on other grounds by Northbrook Life Ins. Co. v. Commw. of Pa., 949 A.2d 333 (Pa. 2008)).  Thus, we agree with the parties that a set-off for already paid benefits is appropriate.

The sole question, therefore, is how to treat future benefits that the defendant may pay the plaintiff on account of his disability.  In support of its position that a set off for future benefits is appropriate, the defendant cites to Carter v. United States, 982 F.2d 1141 (3d Cir. 1992).  In Carter, the plaintiff had been a patient at a VA hospital in Indiana.  He brought a malpractice action against the VA under the FTCA.  Id. at 1143.  Indiana imposes a cap on the amount of damages that can be recovered in a medical malpractice action.  The Carter court addressed whether this cap applied to limit damages for which the United States could be liable.  It also addressed the issue of whether veterans' benefits paid to the patient should be deducted from the total amount of damage incurred by the plaintiff or if it should be deducted from the statutory cap.

The court concluded that the cap does apply to the United States and that the set-off amount should be deducted from the statutory cap not from the actual amount of damages.  Id.  at 1143-44.   This case is thus not

directly on point to the position for which the government cites it.  In fact,

the court used language that does not support the government's position at

all.  It indicated:

> Readers of this opinion should guard against the
> conclusion that we have passed on the question
> whether the projected value of ongoing veterans'
> benefits is an 'advance' payment for purposes of
> Indiana's law.  Today's value of tomorrow's benefits
> is prophesy, not a fact.  Congress could change the
> law, reducing or even eliminating the payments the
> Carters now receive month to month.  Or the
> Carters might renounce receipt of these benefits.

Id. at 1145.  Thus, this opinion provides little support to the government's

position.

The government also cites to Cole v. United States, 861 F.2d 1261

(11th Cir. 1988).  In Cole, a veteran sued for medical malpractice for

treatment rendered at a VA hospital.  The court determined that a set-off

on the damages should be awarded for present value of expected future

benefits.  Id. 1266.  This issue, however, is not the same issue we must

address.  In this case, we must determine how to treat uncertain future

benefits, not expected future benefits.  The parties agree that a set-off

should apply to the past benefits.  It is the future, uncertain, possible but

not guaranteed, benefits that are at issue here.

The cases cited by the government therefore, are not precisely on

point.  The United States District Court for the District of Maine, however,

has addressed the issue which we must decide.  See Poirier v. United States, 745 F. Supp. 23 (D. Me. 1990).  In that case, the plaintiff, Poirier sued the United States for medical malpractice for treatment he received at a VA  hospital in Togus, Maine.  Id. at 24.  The court found that the VA hospital was liable.  Id. at 29.  In assessing the damages, the court addressed whether the government was entitled to a set-off for the amount of disability benefits to be paid to the Poirier in the future.  Id. at 33.  The court did not reduce his award based on future benefits.  Id.  It explained:

> Also the court is hesitant to reduce plaintiffs' award in this case by any future benefits from the VA in light of the uncertainty of those benefits.  It is well known that Congress has the authority to change the level of VA benefits at anytime it may dictate, and the Veterans Administration has the right to adjust its determinations as to the percentage of benefits [plaintiff] is entitled to, again, at anytime based upon employability standards [that are] difficult to articulate with any specificity.

Id.

We agree with the reasoning of Poirier.  It is inappropriate to provide a set-off for non-guaranteed future benefits.  For example, the parties agree that plaintiff is to be reevaluated by the VA in 2014 to determine whether benefits should continue.  There is no guarantee that they will. Accordingly, allowing for a set-off would not be making plaintiff whole.

### 7.  Public policy

Defendant also argues that it is entitled to a verdict because of the public policy that holds that an individual cannot benefit in a civil action from his illegal, immoral or criminal acts.  Evidently, the government views the instant case as an attempt on the part of the plaintiff to benefit from his robbery of a pharmacy in August 2007.   After a careful review, we disagree.

Pennsylvania law provides that "[t]he common law principle that a person should not be permitted to benefit by his own wrongdoing, particularly his own crimes, prevents a plaintiff from recovering losses which flowed from those criminal acts." Holt v. Navarro, 932 A.2d 915, 920 (Pa. Super. Ct. 2007) (citing Mineo v. Eureka Sec. Fire & Marine Ins. Co., 125 A.2d 612, 615 (Pa. Super Ct. 1956)).  The factual scenarios, however, where the principle applies are far different from the instant case.  For example in Holt, the plaintiff, William Holt, had been committed to a hospital for a mental health evaluation.  Id. at 917.  Holt absconded during an ambulance transfer.  He ran to a shopping center and engaged in car jacking.  Id. at 918.   After his conviction, Holt sued the hospital for negligently transporting him.  He asserted that the criminal conviction that resulted from his escape caused him to suffer a reduced earning potential. Id.  A jury awarded the Holt $350,000, however, the Pennsylvania

Superior Court reversed. The court noted that "the no felony conviction recovery rule applies to discourage courts from assisting convicted felons in collecting damages that would not have occurred absent the criminal conviction." Id. at 920. In other words, Holt sought damages for injury that resulted directly from the conviction.

The Pennsylvania Superior Court also applied the rule in Mineo, 125 A.2d 612. In that case, two restaurant owners were convicted of burning down their restaurant. They had four insurance policies on the restaurant, and, after their arrests, they assigned their rights under the policies to a third party. Id. at 614. The third party tried to collect on the policies, but the court ruled that they could not. Id. The third party stood in the identical position as the arsonists would have. The arsonists would not be able to benefit from their crime and therefore the insurance policy holder could not either. Id.

The instant case is readily distinguishable. Plaintiff does not seek to benefit from the commission of a crime like the convicted arsonists in Mineo. Although the facts surrounding this case include criminal acts committed by the plaintiff, plaintiff seeks to recover for medical negligence which rendered him permanently disabled. The crime is basically irrelevant as to defendant's liability. Plaintiff does not allege a chain of causation in which the alleged injury is directly caused by the criminal act as was the

65

case in  Holt.  Hypothetically, even if the plaintiff had not committed the crime, he would still have a professional negligence case against the defendant.  Therefore, this case is not the sort of case where the plaintiff seeks to benefit from the commission of a crime.  Defendant argues that plaintiff lost his job because he had been arrested.   He seeks lost wages from the job he lost because of his arrest.  Therefore, his recovery is barred.  We disagree.   Here plaintiff may have officially been discharged from his employment because he was arrested, however, the evidence reveals that he is now one hundred percent disabled from working due to the defendant's medical malpractice.

### 8.  Loss of consortium

The final issue we must address is Plaintiff Marisol Laskowski's loss of consortium claim. The complaint alleges that at all relevant times Marisol Laskowski and Stanley Laskowski were husband and wife and residing together.  (Doc. 1, Compl. ¶ 79).  Due to her husband's injuries –and the defendant's negligence –Marisol "has lost the consort, companionship, society, affection and support of her husband."  (Id. ¶ 81).  Thus she seeks judgment for damages in excess of $150,000 for loss of consortium. Awarding, Marisol Laskowski damages for loss of consortium is appropriate.

A loss of consortium claim is derivative and can only survive where the injured party's claim has merit.  Schroeder v. Ear, Nose & Throat Associates of Lehigh Valley, Inc., 557 A.2d 21, 22 (Pa. Super. Ct. 1989). In the instant case, we have found that the injured party's claim, does indeed have merit.  Thus, we will address the loss of consortium claim.  A consortium claim is the vehicle through which a plaintiff recovers for "right of one spouse to the company, affection, and assistance of and to sexual relations with the other."  Machado v. Kunkel, 804 A.2d 1238, 1244 (Pa. Super. Ct. 2002).   As no market value for loss of consortium damages, "the amount to be awarded for loss of consortium is left to the sound judgment and common sense of the fact-finder."  Tindall v. Friedman, 970 A.2d 1159, 1177 (Pa. Super. Ct. 2009).

Therefore, we must address the facts as presented at trial.  When plaintiff returned to his family after serving in Iraq, he was a confident and attentive husband.   (Doc. 68, N.T. 9/13/12 at 5).  He helped around the house, helped with the children, and assisted with such chores as washing dishes and taking out the trash.  (Id. at 5-6).   He would go out to dinner with his wife, and was able to go out in crowds and to socialize.  (Id. at 6).

Plaintiff Marisol Laskowski testified regarding the manner in which her relationship with Stanley has changed due to his PTSD.  While he was once an active partner in parenting their children, the assistance he

provides now is much less and Marisol has to monitor the children to make sure that they do not trigger a negative reaction in Stanley. (Doc. 68, N.T. 9/13/12 at 32-33).  He is unable to attend activities, such as dance recitals and karate exhibitions in which his children participate.  (Id. at 28).  He is also unable to do simple things such as take Marisol out to dinner.  (Id. at 30). They cannot take family vacations.  When they tried to go to the Philadelphia zoo, the trip had to be cut short due to Stanley's disorder.  (Id. at 28-29).  She also testified that their intimate relations have changed due to his PTSD.  (Id. at 30-31).  The defendant does not challenge the loss of consortium claim.

Accordingly, we find that Plaintiff Marisol Laskowski has lost much of her husband's company, affection and assistance.  An award of damages for loss of consortium is thus warranted, and we will set forth an appropriate amount for it in our verdict.

**Conclusion**

For the reasons set forth above, we conclude that the defendant committed medical malpractice.   The United States owed a duty to the plaintiff which it breached.  Defendant diagnosed plaintiff with the PTSD from which he suffered but never treated him appropriately.  The defendant provided inappropriate medication and failed to provide psychotherapy. Despite his condition not improving, and plaintiff continually contacting the

68

VA to complain about his symptoms, the defendant never devised a coordinated plan to address his PTSD. As a result the plaintiff suffered harm and is now disabled from working. Plaintiff has suffered past loss wages and will suffer wage loss in the future. Additionally, Plaintiff Marisol Laskowski is entitled to an award of damages for loss of consortium. An appropriate verdict follows.

We emphasize again, that this case is very fact specific and our holding applies only to this plaintiff. Our decision should not be interpreted as an sweeping criticism of the care that the defendant provides to the nation's veterans in general. Our decision is based on the treatment received by this plaintiff as explained by the experts that testified in this case.

Date: 1/16/13        s/ James M. Munley
                                 Judge James M. Munley
                                 United States District Court